UNITED STATES of America, Plaintiff,

v.

DIEBOLD INCORPORATED, and Herring-Hall-Marvin Safe Company, Defendants.

Civ. A. No. 4485.

United States District Court
S. D. Ohio, W. D.

March 8, 1961.

Hugh K. Martin and Joseph P. Kinneary, U. S. Attys., Columbus, Ohio, Richard Pennington, Cincinnati, Ohio, Larry Williams, John Toohey, Washington, D. C., for plaintiff.

Abe Fortas and Wm. L. McGovern, Arnold, Fortas & Porter, Washington, D. C., Frederick A. Reister, Millikin, Reister, Fitton & Lattimer, Hamilton, Ohio, Murray Monroe, Cincinnati, Ohio, for Herring-Hall-Marvin.

DRUFFEL, District Judge.

### Findings of Fact

#### Description of Acquisition

1. On September 11, 1959, Diebold, Incorporated (Diebold) acquired the assets of Herring-Hall-Marvin Safe Company (HHM) for $3,000,000 cash and the assumption of all liabilities.

2. The acquisition resulted from an offer, in May 1959, by Mr. Mosman, president of HHM, of a quick cash sale of the assets of HHM to Diebold. As a basis for negotiating the sale, Mr. Mosman tendered Diebold a balance sheet as of April 30, 1959, which reflected that HHM had a cash balance on that date of $115,507.32. Both the option agreement between Diebold and HHM of June 16, 1959, and the purchase agreement of July 17, 1959, referred to and were based on the balance sheet of April 30. Subsequently, and prior to the execution of the option agreement, Mr. Mosman informed Diebold he could not warrant the balance sheet of April 30, 1959 because, for the purpose of that sheet, he had reclassified $100,000 of "receivables" as "cash". A recent audit of the books of HHM discloses that the balance sheet of April 30, 1959, also failed to reflect $28,165.36 of outstanding April payroll checks. Instead of the purported cash balance of $115,507.32 on April 30, 1959, HHM actually had a net overall deficit cash balance (overdrafts outstanding) of $12,658.04.

3. At the closing of the purchase on September 11, 1959, Diebold representatives were informed that HHM could not present a check for the balance in its principal depository, the First National Bank and Trust Company of Hamilton,

because that account was overdrawn by approximately $50,000. Checks were tendered for small amounts in other banks ranging from $800. to $9,477.90. Actually, the HHM account at the First National Bank and Trust Company of Hamilton had overdrafts outstanding on September 10, 1959, of $53,978.59. Crediting against this deficit the smaller amounts in other banks, HHM, on September 10, 1959, had a net overall deficit in all bank accounts in the amount of $35,596.61.

### Financial Condition of HHM During 1959

4. At all times between June 1950 and September 11, 1959, when HHM was acquired by Diebold, HHM had been short of working capital and, from 1953 on, HHM had found it necessary to make frequent use of bank loans on a straight note basis to finance the company's annual sales volume.

5. In an effort to improve its net working capital position, HHM consistently retained substantially all of its earnings after taxes and the proceeds from the periodic liquidation of its readily disposable divisions and subsidiary companies. In 1954, the company received and retained $150,000 in insurance proceeds resulting from the complete destruction by fire of the facilities of its subsidiary, Thomas Manufacturing Company. In fiscal 1955, it sold its Quickdraft division for $100,-000 on time payments. In fiscal 1959, it sold its Remington division for $98,000 and its Canadian subsidiary for $130,-000.

6. HHM's balance sheets from June 1950 down through 1958 continuously reflected liabilities well in excess of tangible net worth, and its current ratio (the relationship of its current assets to its current liabilities) averaged only approximately 1.5 for the years 1951 through 1959 in contrast with an average of 2.7 during the same years for all manufacturers of fabricated metal products. By June of 1959, HHM's cash position was such that its net quick asset ratio (the relationship between cash and government securities on the one hand and current liabilities on the other) dropped to .074 the lowest in HHM's experience since 1951 and less than one-fifth the average net quick ratio of all companies in the fabricated metal products industry. By September 11, 1959 when Diebold acquired HHM, HHM's net quick asset ratio had declined to .03.

7. HHM's sales reached a peak in 1956–57 when the company had net sales of $10,672,000. In each of the next two years, fiscal 1958 and fiscal 1959, HHM's sales fell approximately $300,000 each year under the preceding year, to a low for fiscal 1959 of $10,023,000.

8. As sales fell in fiscal 1959 by approximately $300,000, inventories built up in the amount of $262,000.

9. Subsequent examination of the books and records of HHM disclosed the following financial condition that faced the company as the year 1959 wore on: out of 114 working days between April 1, 1959, and the consummation of the sale on September 11, 1959, HHM had overdrafts outstanding against balances in its principal depository (First National Bank and Trust Company of Hamilton) on 69 days (60% of the working days) in amounts ranging from $104.51 to $78,-394.58. Similarly, the company had total net overdrafts outstanding on all of its commercial bank accounts on 41 days during the same period in amounts varying from $1,123.72 to $66,890.68.

10. Subsequent examination and audit of HHM accounts also disclosed that: (1) during the entire month of May 1959 the regular payroll account of HHM in the First National Bank and Trust Company of Hamilton had payroll overdrafts outstanding in amounts ranging from $24,466.29 to $54,297.52: (2) during at least half the month of May the overdrafts on the regular payroll account were subsequently reimbursed by overdrafts on HHM's general account in the First National Bank and Trust Company of Hamilton which account itself had overdrafts outstanding in amounts

ranging from $38,551.37 to $116,809.86; and (3) on May 1, 1959, the HHM accounts in all banks had overdrafts outstanding against them in the amount of $79,037.17, and on May 8, the accounts in all banks had overdrafts outstanding in the amount of $57,325.79.

11. The annual examination by the HHM auditors of the books of account disclosed that the June 30, 1959, balance sheet of HHM which purported to reflect a net cash balance in the regular account at the First National Bank and Trust Company of Hamilton, Ohio of $35,942.21, failed to reflect outstanding checks in the amount of $46,858.62. When adjustment was made by the auditors to account for these undisclosed and outstanding June checks, HHM was shown to have had overdrafts outstanding on the regular account of the First National Bank and Trust Company of Hamilton as of June 30, 1959, in the amount of $10,916.41.

12. Recent audit of the HHM books and records also disclose that while HHM apparently had $13.92 on deposit in the First National Bank and Trust Company on September 3, 1959, the company actually had overdrafts outstanding as of September 3 on this bank in the amount of $73,127.80.

13. HHM's bank statements showed modest minimum monthly balances in its principal depository, the First National Bank and Trust Company of Hamilton; January, $97,535; February, $142,586; March $75,743; April, $6,143; May $27,-871; June $44,741; July $33,751; August $55,308; September $13. These bank balances do not properly reflect the financial condition of HHM because (1) they failed to reflect the outstanding checks sent to creditors which represented overdrafts that had not yet cleared the bank on 60% of the working days between April 1 and September 11, 1959; and (2) they failed to reflect an inflation of bank balances created by the company itself through transfer, from time to time, of funds by check within its own bank accounts, e. g., on January 30, 1959, HHM drew a check for $34,000 on Wells Fargo Bank (San Francisco) for deposit in Irving Trust Company (New York) on the same day, a check for $34,000 was drawn on Irving for deposit in Peoples First National Bank and Trust Company (Pittsburgh); and on the same date, a check in the amount of $34,000 was drawn on Peoples for deposit in the First National Bank and Trust Company (Hamilton, Ohio). HHM only had one $34,000 deposit to transfer, but on February 2, 1959, the total aggregate balances reflected in all four banks credited $136,-000.

14. On December 30, 1958, HHM borrowed $250,000 on demand notes from its principal depository, the First National Bank and Trust Company of Hamilton, which was limited by law to an indebtedness of $300,000 to any one customer. On May 6, 1959, HHM, again on demand notes, increased its loan to the limit of $300,000. On May 13, 1959, the loan was reduced to $250,000 but on September 11, 1959, HHM, again on demand notes, increased its loan to the limit of $300,000. On deposition, the president of the bank testified that the bank did not wish to carry this loan at the legal limit permanently and that if the bank had called upon HHM to pay off the demand notes, he did not know where the company could have obtained the funds to do so. Defendant Diebold paid off the $300,000 of HHM demand notes on September 16, 1959.

15. In March 1959, at the expiration of its annual contract, the HHM Union, Safe Workers Organization, Chapter 1, presented the company with demands for wage costs which were higher than those common in the area or the industry. These demands placed the company at a competitive disadvantage by increasing wage costs and decreasing efficiency. Because of its limited working capital position and the highly competitive nature of the industry in the spring of 1959, the company could not stand a strike, and it finally accepted the Union's terms. Before accepting these terms, however, the president of HHM Mr. Mosman, gave serious consideration to recommending to

the Board of Directors that the company be liquidated.

16. Examination and audit of the books of account of HHM immediately upon Diebold's taking possession of them reflected the fact that the company had suffered operating losses between July 1 and September 10, 1959, of $206,953.51.

17. Subsequent examination and audit of the books of account of HHM reflected that as of September 11, 1959, HHM had accumulated past due trade bills dating back to prior to January 1959 in the amount of $244,127.68. In addition to this amount of past due accounts, HHM on September 11, 1959, also had currently due trade bills in the amount of $499,833.66.

18. HHM followed the procedure of preparing commercial accounts' checks at the time the invoices were approved, but of not releasing them until later because of lack of funds on the due date. As a result, a lapse of between 30 and 120 days between preparation of a check and its issuance and cancellation by the bank was not unusual. During the first 9 months of 1959, the following checks cleared the bank more than 30 days after the date of the check; January, 208; February, 142; March, 134; April, 134; May, 146; June, 107; July, 137; August, 175; September 1–11, 29. Illustrative of this practice were checks Nos. 17470 and 17471 drawn to the order of the Aluminum Company of America for $3,349.61 and $16,494.41, respectively, both dated January 15, 1959, and both canceled by the bank on April 10, 1959, although on December 30, 1958, the Aluminum Company of America specifically declined a request of HHM that its 30 days net credit terms be extended to 90 days.

19. As a result of the overdraft disclosed to Diebold at the closing on Friday, September 11, 1959, Diebold caused $200,000 in cash to be deposited in the First National Bank and Trust Company of Hamilton on the second next banking day, September 15, 1959. Shortly thereafter, on September 28, 1959, Diebold deposited an additional $300,000 in cash in the First National Bank and Trust Company of Hamilton. A subsequent deposit on October 22, 1959, brought the aggregate cash advances by Diebold between September 15 and October 22, 1959, to a total of $503,801.90 to meet current and past due obligations of HHM. By July 31, 1960, these cash advances aggregated $840,000.

20. Although the annual balance sheets and profit and loss statements purported to show a modest improvement in HHM's financial condition from year to year, these "book" figures failed completely to reflect the actually insolvent condition of the company. The books were prepared in accordance with management policy. The Treasurer of HHM was informed by the President on June 16, 1958, of the following "goals for June 30, 1958" (fiscal year-end): "I would like to show a net profit, after taxes, of at least $150,000" and "I would like to show a net worth of approximately $2,100,000." The Treasurer noted "OK" on these instructions, and the June 30, 1958, balance sheet showed net worth of $2,126,502 and the profit and loss statement showed net profit after taxes of $188,814. These figures were confirmed by HHM's auditors.

21. Upon the disclosure to Diebold at the closing on September 11, 1959, that HHM had overdrafts outstanding against its bank balances and upon the discovery that HHM had suffered an operating loss of $206,000 between July 1, 1959, and September 11, 1959, Diebold immediately called in H. B. Maynard and Company, independent management consultants, to conduct a survey of operations in the Hamilton plant of HHM. Maynard engineers spent approximately six weeks in the plant surveying manufacturing techniques, worker efficiency, and managerial and supervisory competence. As a result of this survey, Maynard and Company prepared performance reports which indicated (1) manufacturing methods in the HHM plant were poorly conceived and inadequately supervised; (2) tooling and equipment lacked modern design and showed little ingenuity or

imagination; and (3) labor performance achieved only a level of 70–75% of standard as compared with the 92–93% level of performance assumed to exist by the old HHM management. The Maynard report concluded that HHM was a high-cost producer which could exist only as a marginal operation and which could probably not survive in a highly competitive market. The survey indicated that substantial cost reductions could and should be immediately initiated in the HHM plant.

22. Correction of many of the deficiencies found in the HHM plant by the Maynard engineers required revision of the uneconomic Union contract which Diebold acquired from HHM and which produced low productivity and high wage costs on the Hamilton plant. In March 1960, Diebold began bargaining with the Union, seeking to get improved productivity in this plant. The bargaining dragged on through March, April, May and June. Diebold finally notified the Union that unless it could work out a contract which would give it reasonable productivity so as to make the plant competitive, the losses it was incurring in the operation of the plant would force Diebold to close it. On July 7, 1960, the Union signed a two-year contract that (1) eliminated the arbitrary wage escalator clause that had permitted uncontrolled inflation of costs, (2) removed the prior prohibitions on wage incentive plans and provided for a wage incentive plan, and (3) gave Diebold a two-year contract, thus avoiding the cost, time and uncertainty of year to year bargaining.

23. Operations of the HHM Division of Diebold continued during the first seven months of 1960 to reflect losses, culminating in a loss of $106,000 for the month of July 1960.

24. In addition to the deficiencies in manufacturing performance at the HHM plant, there has been a sharp loss in business by HHM Division. In the eight months ended August 31, 1960, orders entered by the HHM Division declined $2,307,707, or 29.8% from the similar eight-month period of 1959. Excluding government orders, the decline in commercial business was even more severe, aggregating 40% under the first eight months of 1959. Shipments for the first eight months of 1960 exceeded new orders by $449,000, or approximately 10%, and by January 31, 1961, orders shipped had fallen to a level of approximately $409,000 per month, or $4,900,000 annually.

25. The decline in sales and shipments of the HHM Division has required the continuous lay-off of employees at the Hamilton plant, including a lay-off of 95 employees on February 1–4, 1961. Employment at the plant has declined from 664 employees on September 11, 1959, to 370 on January 31, 1961, a total decline of 294 employees, or approximately 45%.

26. When a rumor spread around during the latter part of 1958 and the first half of 1959 that the stock or assets of HHM might possibly be for sale, three different promotors solicited the HHM ownership-management to consider tentative schemes for acquiring, merging, or exchanging the stock or assets of HHM. None of these overtures ever approached the concreteness of a firm offer or a firm price and no financial data or operating figures were supplied by HHM. Diebold made the only firm, bona fide offer to pay $3,000,000 cash and to assume all liabilities.

27. Diebold was in need of additional plant space to which it might remove part of its production from its overcrowded facilities in Canton, Ohio, where efficient, economical expansion was not feasible.

### Conclusory Findings

28. At the time of its acquisition by Diebold on September 11, 1959, and for at least 9 months prior thereto, HHM was hopelessly insolvent and faced with imminent receivership.

29. The facts concerning HHM's true financial condition were never disclosed to Diebold or to any of the promotors mentioned above. HHM's opportunity to

achieve a sale on the terms it sought, and obtained from Diebold, was contingent upon the swift conclusion of a sale without exhaustive analysis of its books and records. Diebold was in need of additional plant space to handle existing business. It purchased on HHM's terms, in reliance on HHM's representations, without full access to HHM's books and records.

30. Diebold was the only bona fide prospective purchaser for HHM's business. Aside from Diebold, no one else ever made an actual offer for HHM's business or property.

31. Diebold's acquisition of HHM did not threaten, or actually cause, a lessening of competition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. A. § 18. By reason of its precarious financial condition, HHM could not long have survived as an independent competitor in its line of business and could not have achieved a sale to anyone else. But for the sale to Diebold, HHM would have been forced to liquidate its business in insolvency proceedings, with resultant heavy losses to employees, creditors, and stockholders.

### Conclusions of Law

1. The Court has jurisdiction over the defendants and the subject matter of this suit.

2. There is no genuine issue as to any material fact.

3. HHM, at the time of its acquisition, was a failing company with resources so depleted and the prospect of rehabilitation so remote that it faced imminent receivership with resulting loss to its stockholders and injury to the community where its plant was operated.

4. Diebold was the only bona fide prospective purchaser able and willing to pay $3,000,000 and to assume the liabilities of HHM.

5. The defendant Diebold is entitled to judgment as matter of law.

### Judgment

This cause was heard on defendant Diebold's Motion for Summary Judgment, and the Court having considered the motion, the pleadings, the affidavits and depositions on file, and being fully advised in the premises, it is

Ordered and adjudged, that defendant Diebold's Motion for Summary Judgment be and the same is hereby granted.