**GENERAL FOODS CORPORATION,
Petitioner,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

**No. 15910.**

United States Court of Appeals
Third Circuit.

Argued June 6, 1967.

Decided Nov. 9, 1967.

Gerhard A. Gesell, Covington & Burling, Washington, D. C. (Roberts B. Owen, Gerald P. Norton, Covington & Burling, Washington, D. C., Kendall M. Cole, White Plains, N. Y., on the brief), for petitioner.

Thomas F. Howder, Federal Trade Commission, Washington, D. C. (James

McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Frederick H. Mayer, Washington, D. C., on the brief), for respondent.

Before STALEY, Chief Judge, HASTIE, Circuit Judge, and SHERIDAN, District Judge.

## OPINION OF THE COURT

STALEY, Chief Judge.

Appellant, General Foods Corporation (hereinafter "G.F."), seeks to have reviewed and set aside a final order of the Federal Trade Commission. The Commission's order required G.F. to divest itself of all S.O.S. assets acquired in violation of § 7 of the Clayton Act, 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1964), amending 38 Stat. 731 (1914).[1] The precise determination was that G.F.'s acquisition of S.O.S. "will in fact substantially lessen competition in the steel wocl pad market."

Both before and after the acquisition, which occurred on December 31, 1957, the major source of revenue for S.O.S. came from the sale of its household steel wool pads. These pads are produced by a shaving process in which a specifically manufactured steel wool wire is drawn through a machine containing a series of cutting knives. As the wire is drawn against the knives, strands of steel wool with triangular cross sections are shaved off and collected in ribbons. Thereafter, these ribbons are formed into balls or pads, the majority of which are impreg-nated with soap, dried, and packaged for sale.

Steel wool pads make a particularly effective abrasive. The three exposed cutting edges or cross sections perform in much the same manner as a knife abrasing by cutting or shaving the surface to which the steel wool is applied. With the addition of soap to the pad to facilitate its abrasive action, steel wool makes a highly effective scouring and cleansing agent.

The steel wool cutting machines are comparatively large, complicated machines, not generally available on the open market, but are custom made to the manufacturer's specifications. A German manufactured machine is available but is not as efficient as its American counterpart. The machines can be used for no other function than the production of steel wool. Wool manufactured from materials other than steel are impractical because of the high cost of the raw materials.

G.F. is one of the largest producers and distributors of packaged food in the United States.[2] All its products are low-priced high-turnover household consumer commodities sold to customers through the same grocery and supermarket outlets as are S.O.S. steel wool soap pads. Between 1955 and 1964, its net sales rose from $825 million to $1.3 billion, and its net assets from $279 million to $436 million, an increase of 57.6% and 56.2% respectively.

---

1. The pertinent portion of the statute provides:

   "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1964), amending 38 Stat. 731 (1914).

2. G.F. is divided into five operating divisions which manufacture and distribute its products—the operations of the five divisions are supported by a Distribution Sales Service Division, an Institutional Food Service Division, and a Technical Center for research. Each division is headed by a general manager who reports to a corporate vice-president and who is responsible for executing his own "business plan" following review and approval by higher levels of authority. Each division consists of regional sales districts with each division having its own sales force. The exception to this is the "Kool Aid" division, which distributes its products through independent brokers.

Because the self-service outlet is the primary source of distribution for its products, G.F. endeavors to create a desire for a particular product in the mind of the shopper, thereby enabling her to make a distinction among the different brands of a similar commodity. It is "an unrelenting effort to presell the housewife." [3]

Mass advertising and market promotions are essential factors in the effort to achieve this goal. In 1957 G.F.'s advertising and sales promotions aggregated $69 million, and in 1958 $87 million. By 1961, G.F. ranked third among all national advertisers, with most of its advertising expenditures going into television advertising.

Prior to the acquisition, the steel wool industry had been an almost perfectly balanced duopoly.[4] But in terms of regional, as distinguished from national sales, S.O.S. managed to achieve a monopoly position in many areas.[5] G.F., however, was not satisfied with the market position of the company it acquired. Soon after the acquisition, appellant concluded that the entire marketing and advertising approach of S.O.S. needed rejuvenation. This task was entrusted to an advertising agency then handling other G.F. products. The new agency succeeded in enhancing the S.O.S. image by skillfully emphasizing different aspects of the product than had previously been featured and by persuading G.F.'s management that they should place an almost total reliance on television advertising.[6]

A survey of sales' statistics for the household steel wool industry reveals the

3. Advertising, according to G.F., embraces all phases of commercial communication with consumers, and all of the many consumer "deals" and incentives. Between 1957 and 1964, G.F. more than doubled its expenditures on consumer promotions, from $9 million to $18.9 million.

Similarly, G.F. also was of the opinion that a successful marketing program should include not only persuasion of the housewife to select G.F.'s products from the shelves but also the retailer to place them on the shelves. Commensurate with this idea, G.F. spent $9.8 million on trade promotions in 1957. Six years later, its expenditures in this area had more than tripled, rising to $31.5 million.

4. In 1957, the total sales for the steel wool industry amounted to $28.6 million. The sales of the largest competitor, S.O.S., amounted to $14.6 million, or 51%, and those of Brillo, to $13.6 million, or 47.6%. Three small producers accounted for the remaining 1.4% of the total sales. None of these smaller companies had sales of over a half-million dollars.

In 1957, S.O.S. had net assets of almost $6 million while Brillo's assets, in 1958, amounted to $8 million. None of the other industry competitors possessed assets of as much as a half-million dollars.

5. In April-May of 1957, S.O.S' sales represented 77.5% of total sales on the Pacific coast, 75% in Chicago, 68.5% in the west-central region, 65.7% in the southwest region, 60% in New England, 58.4% in the east-central region. Brillo scored very heavily in the metropolitan New York area, accounting for almost 77% of total sales there.

Traditionally, the industry has sold its products on a delivered-price basis on all orders exceeding a minimum amount with the manufacturer absorbing the cost of transportation. Due to the high cost of shipping, the manufacturer confined the distribution of its product to the region of its plant's location. Only S.O.S. and Brillo, with higher prices than the smallest companies, were in a position to absorb the high freight.

6. Prior to the acquisition, in the period from 1954 through 1957, S.O.S. spent approximately $1.25 million yearly for television advertising. After the acquisition, in the period from 1960 to 1963, expenditures rose to a yearly average of $2.25 million, an increase of approximately 80%.

One reason for the increased expenditures was a decision to advertise on more expensive evening shows. S.O.S. had formerly recognized that advertising on nighttime shows was preferable but had felt that the expense was prohibitive. G.F., however, as one of the nation's largest purchasers of television advertising, could command some of the choicest shows at prime time evening hours. And since S.O.S. advertising could be combined with that of other G.F. products, S.O.S. not only gained access to choice shows at prime time but earned G.F.'s greater discounts computed on the basis of G.F.'s huge combined advertising purchases for all its products.

dramatic change that G.F. was able to effect. During the period from 1955 to 1957 total sales in the industry rose from $24.2 million to $28.6 million, a market expansion of over 18%. The sales of S.O.S., however, increased by only 14.5% from $12.7 million in 1955 to $14.6 million in 1957. S.O.S. thus failed to keep pace with the expanding market, its share falling from 52.8% in 1955 to 51% in 1957. Contrasted with this decline is the rise of Brillo's market share during the same period, going from 45.7% in 1955 to 47.6% in 1957. Brillo's sales increased by 23.4%, a rate markedly more rapid than that for the industry as a whole.

The downward trend in the market position of S.O.S. continued for a period of time after the acquisition due to G.F.'s preoccupation with the integration of S.O.S. into its own organization. Brillo, during this same period, continued to grow faster than the market; its sales increased, for example, from $14.4 million in 1958 to $14.9 million in 1959, a gain of 3.8% as compared to a total market expansion of 2.8%.

Beginning in 1960, with the post-acquisition period coming to a close, the advantages derived from G.F.'s great competitive strength began to make themselves evident, and the fortunes of S.O.S. took an upward turn. Sales began to accelerate sharply and at a much faster pace than those for the total industry.[7] Between 1959 and 1962, the sales of S.O.S. rose from $15.2 million to $19.2 million, a gain of 26.5%. Total industry sales, however, increased by only 11.5%, from $30.7 million to $34.2 million. Sales of S.O.S., therefore, expanded at more than twice the rate of the household steel wool market, and the market share of S.O.S. grew from 49.4% in 1959 to 56% in 1962.

In the face of this remarkable comeback by S.O.S., Brillo's position deteriorated rapidly. Even though industry household steel wool sales increased by 11.5%, Brillo's sales actually decreased from $14.9 million in 1959 to $14.3 million in 1962, a decline of 4.2% in an expanding market.[8] Confronted with steadily falling sales, a dangerously declining market share, and mounting advertising and promotional expenses, Brillo, in December 1963, ceased operations as an independent company and merged with Purex Corporation, Ltd.[9]

7.  Trade and consumer promotions for the sale of S.O.S. pad were also more energetically engaged in by G.F. And owing to its integration in G.F.'s market-centered distribution system, S.O.S. would naturally benefit from the systems attendant advantages. The integration enabled S.O.S. to induce purchases of its products by: (1) granting customers discounts based on pooled purchases of the products of G.F.'s various divisions; (2) giving customers the convenience of including orders of S.O.S.' products in their orders of other G.F.'s products; and (3) improving national availability.

8.  Nowhere is the contrast between G.F.'s power in the market and Brillo's inability to cope with this power painted more starkly than in the most important local market in the United States, New York. Twenty per cent of all soap pad consumption takes place there. With its manufacturing facilities located in the area, Brillo dominated the market prior to the merger, outselling S.O.S. at retail during August and September 1959, by almost 6 to 1 (84.9% v. 15.1%) on a per pad basis.

For years S.O.S. had attempted, without success, to penetrate the New York City market. After the acquisition, however, G.F. was able to effectively realize a substantial increase in S.O.S.'s share of this market. Resulting largely from advertising, by September 1963, G.F. had gained control of 31.8% of the combined S.O.S.-Brillo retail market, reducing Brillo's share to 68.2%.

Faced with this vigorous competition not only in New York City but throughout the country, Brillo countered by introducing a new package and by escalating its advertising and promotional expenditures. Brillo also began the heavy use of consumer and trade promotions, although, in previous years, it had resorted to these devices only sparingly. Despite these efforts, Brillo fell further and further behind.

9.  Purex is a multi-product manufacturer and distributor of household cleaning agents, having total sales of about $127 million in 1963.

## I

■■ Section 7 of the Clayton Act prohibits any merger which may substantially lessen competition or tend toward monopoly "in any line of commerce." Prohibition of a merger depends, not upon the form it assumes, but upon the realities of the market in which the merged companies operate. Federal Trade Commission v. Procter & Gamble Co. (hereinafter "Clorox") 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); Reynolds Metals Co. v. Federal Trade Commission, 114 U.S.App.D.C. 2, 309 F.2d 223 (1962). The fact that different products may in some sense be competitive with each other is not sufficient to place them in the same market if by themselves they constitute distinct product lines. United States v. Aluminum Co. of America (Alcoa–Rome Cable), 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Nor does the availability of substitute products compel the conclusion that they belong in the same relevant market. United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), Reynolds Metals Co. v. Federal Trade Commission, supra.

In Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), the Supreme Court addressed itself to the task of clarifying some of the uncertainty surrounding the concept of relevant market. There, the Court said:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for anti-trust purposes. United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as *industry or public recognition of the submarket as a separate*

*economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors."* (Emphasis supplied.)

In the present case, the Commission followed, as far as possible, the guidelines laid down in *Brown* Shoe. It found that the appropriate line of commerce or relevant product market within which to test the impact of the G.F.–S.O.S. merger was household steel wool. Appellant challenges this finding, accusing the Commission of "untenable gerrymandering" because of its failure to include in the relevant market numerous nonsteel wool household aids that G.F. introduced into the record. Appellant further argues that even if the market definition was technically tenable, the Commission nevertheless erred in assessing the impact of the merger by treating nonsteel wool scouring devices as though they did not exist.

■ At the outset, it is important to note that G.F. does not quarrel with the legal principles that guided the Commission. Rather, appellant contends that the Commission not only did not find sufficient facts to satisfy the *Brown Shoe* criteria, but that many of the facts that were found had no basis in the record. On this latter point the law is clear: the Commission's factual findings "if supported by evidence," are conclusive. See 15 U.S.C. § 45(c) (1964); Universal Camera Corp. v. NLRB, 340 U.S. 474, 487, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We have long recognized that "[o]ur job is not to retry [a] case. We have no right to substitute a different view from that of the Commission so long as we have determined that its findings have substantial support in the whole record." C. Howard Hunt Pen Co. v. Federal Trade Commission, 197 F.2d 273, 278 (C.A.3, 1952). Suffice it now to say that we find there is substantial evidence to support those facts found by the Commission. We shall shortly elaborate on this point, but first we turn to appellant's argument that there were in-

sufficient facts for the Commission to determine that the relevant market in this case was household steel wool.

It is urged that *Brown Shoe* enumerates seven factors to be considered when evaluating the relevant product market, and that the Commission erred by ignoring the significance of the inapplicability to this case of two of the seven *Brown* criteria. It is true that the Commission did not make a special finding as to the existence of *specialized vendors* and *distinct customers*, but we do not think that this, in itself, indicates that the relevant market was erroneously delineated. Our reading of *Brown Shoe* discloses no requirement that each of the seven criteria must be present in every merger case. In fact, there is at least one case where a well-defined submarket was held to exist where only three of the *Brown* criteria were present. Reynolds Metals Co. v. Federal Trade Commission, 114 U.S. App.D.C. 2, 309 F.2d 223 (1962).

We now return to G.F.'s contention that the Commission erroneously found many of the crucial facts in this case. As mentioned earlier, we think this argument is without merit. The Commission found that there was a definite *industry recognition of the household steel wool submarket as a separate economic entity*. This finding is supported by testimony of several household steel wool producers stating that they only looked to other steel wool producers in setting prices and in reaching marketing decisions with respect to their products. As far as these producers were concerned, their only serious competition was with those companies in the industry who manufactured household steel wool. Little or no attention was paid to producers of materials other than steel wool. Indeed, G.F. itself recognized that competition offered by nonsteel wool products is at best "indirect."

Prior to acquiring S.O.S., G.F. made a detailed study of the soap pad business and its competition. In part this study stated:

" * * * Brillo, the only significant direct competition, has been in the field for years without retarding S.O.S. We are unaware of any new inventions or products which would jeopardize the S.O.S. market. S.O.S., through Tuffy, is setting up its own *indirect* competition.[10] Other *indirect* competition includes abrasive sponges and bronze or stainless steel scouring pads. S.O.S. has an opportunity to introduce such items as new products under its own label." (Emphasis supplied.)

In light of the foregoing report, it is difficult to understand how appellant can seriously expect us to believe that nonsteel wool devices, including Tuffy, are directly competitive with household steel wool products. Our incredulity is heightened by the fact that the majority of products which appellant now contends to be close substitutes were in existence and on the market at the time of G.F.'s pre-acquisition study. As stated by the Commission:

" * * * [I]f [appellant] and the other steel wool soap pad manufacturers regard themselves as a separate market, then it is this market in which the impact of [appellant's] acquisition must be judged. It cannot be said that the existence and conduct of other manufacturers outside the market must be considered where the soap pad manufacturers themselves do not take these substitute product manufacturers into account in their own pricing and marketing decisions." General Food Corp. —— F.T.C. —— (Dkt. 8600, 1966).

The Commission further found that steel wool pads have *peculiar characteristics and uses*. Testimony and exhibits relating to the *physical composition*, operational characteristics, and stated uses for household steel wool substantiate this finding. Nonsteel wool products assume

---

10. "Tuffy" is appellant's own plastic product, and according to a study prepared for appellant in 1962 it is by far the largest selling of all the nonsteel wool cleaning devices that appellant seeks to include in the relevant market.

variant forms bearing little resemblance to steel wool and their compositions range from plastic, to copper, to abrasive-surface sponges. But appellant argues that these products are functionally similar to the steel wool soap pad. An attempt is made to support this argument by pointing to advertising claims made by some of the allegedly direct competitors. The attempt is unsuccessful. Advertising puffs will not be considered by this court as evidence of that which could not be proved below. We prefer to place reliance on testimony given by both the former general manager of appellant's Kool-Aid Division and the pre-acquisition president of S.O.S. These gentlemen stated that, to the best of their knowledge, there was no available device that would perform as well as the steel wool soap pad for the purposes advertised on the S.O.S. box.

Appellant's argument respecting the alleged similarity between household steel wool and the synthetic devices is further attenuated by G.F.'s aforementioned pre-acquisition report. This report noted:

> "S.O.S. in the kitchen is used primarily for scouring pots, pans, stoves, etc., while Tuffy is used much as a dishrag is used."

Surely, appellant does not expect us to find that "Tuffy," one of the largest selling synthetic products, has the same characteristics and uses as the steel wool soap pad when its own officials admitted that it was not manufactured or used for scouring pots and pans, but primarily as a dishwashing aid. These admissions, together with related facts found by the Commission, support the conclusion that household steel wool has peculiar characteristics and uses.

Adhering to the *Brown Shoe* guidelines, the Commission next compared the retail sales price of steel wool soap pads with the prices of allegedly competing products. After carefully computing and contrasting the prices of all the products in both categories, the Commission concluded that *household steel wool products are sold at distinct prices.* Appellant strongly objects to this conclusion on the ground that many of the nonsteel wool devices (13 of which generally sell for 29 cents and one of which usually sells for 27 cents) are comparable to those of Brillo and S.O.S. soap pads (approximately 28 cents per package). At first glance this argument appears to have merit. But further analysis persuades us that the Commission's focus on the selling price of individual steel wool soap pads was the only practicable way in which to approach the problem. The Commission found that prices of steel wool soap pads range between 1.4 cents to 2.8 cents per pad, while nonsteel wool products are sold between 6 cents and 29 cents per item. Appellant, however, urges that the proper test is one of comparing the life expectancy of a 28 cent package of steel wool soap pads with the longevity of a similarly priced package of a nonsteel wool product. We agree with the Commission's view that the very necessity of resorting to such estimates in order to compare prices tends, by itself, to demonstrate the distinctiveness of the prices of the household steel wool products.

Almost no evidence was introduced on behalf of the Commission concerning consumer sensitivity to price changes. There is, however, sufficient evidence to support the finding that the *prices of household steel wool products display no sensitivity to prices of nonsteel products.* Without exception, the smaller steel wool manufacturers testified that they disregarded the pricing structure of the nonsteel wool devices. These manufacturers stated that they looked only to prices established by S.O.S. and Brillo when making pricing decisions. The former general manager of G.F.'s S.O.S. operation stated that he and other high level executives paid little attention to the sales volume and pricing structure of the nonsteel wool products. And, not surprisingly, the present general manager, when questioned closely, evidenced a general lack of knowledge of the prices of many of these allegedly competing products.

Finally, the Commission found that the equipment used for the production of steel wool is distinct from, and lacks any similarity to, the facilities required to manufacture the other cleaning devices that appellant contends should be included in the relevant market. It seems to us that this finding is self-evident and unimpeachable. Steel wool producing machinery is not available on the open market, but must be custom made to specification. It cannot practically be used to manufacture other products. To argue that S.O.S. did not utilize *unique production facilities* would be to ignore the obvious.

To summarize, we think that there is substantial evidence in the record to support the Commission's finding that the relevant product market is household steel wool. It has been shown that household steel wool products constitute an economically significant market and that this market is sufficiently inclusive to be meaningful in terms of trade realities. See Crown Zellerback Corp. v. Federal Trade Commission, 296 F.2d 800, 811 (C.A.9, 1961), cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962). Some of the more significant trade realities in this case include the existence of unique steel wool producing machinery, industry recognition of the household steel wool submarket as a separate economic entity, the peculiar characteristics and uses of household steel wool, a distinct pricing structure, and the lack of sensitivity to prices of nonsteel products.

The Commission's delineation of the relevant market rested upon a carefully reasoned review of the applicable legal precedents and a thorough analysis of the relevant facts. Much of the evidence supporting the Commission's determination consists of studies and analysis made by G.F.'s own management in evaluating the possibility of profitably acquiring S.O.S. Testimony of G.F.'s officials as to how they actually operated the S.O.S. division and whom they regarded as their real competition lends added weight to the finding that household steel wool is the relevant product market for purposes of this case.

We therefore reject appellant's contention that non-steel wool cleaning devices constitute part of the relevant market and hold that there is substantial evidence in the record to support the Commission's finding that household steel wool constitutes a relevant market within the meaning of Section 7.

## II

The essential issue remains whether the Commission had substantial evidence to support its finding that the acquisition of S.O.S. by G.F. would have a substantial anticompetitive effect in the household steel wool market. In evaluating the record before us, we are mindful that the facts must show more than a "mere possibility" of an anticompetitive effect. United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 598, 77 S.Ct. 872 (1957). However, the language of § 7 clearly indicates that the Commission need not show that competition has been, or is being restrained, but only that " * * * the effect of such acquisition *may be* substantially to lessen competition, or to tend to create a monopoly." (Emphasis supplied.) As summarized by the Supreme Court in *Clorox:*

> "Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. * * The section can deal only with probabilities, not with certainties. * * * And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." 386 U.S. at 577, 87 S.Ct. at 1229.

On the basis of our review of the record, the Commission's opinion, and the recent holding in *Clorox,* supra, we will affirm the Commission's order.

In general business parlance, the instant acquisition would be classified as a conglomerate merger. A merger is considered conglomerate when the relationship of the merging companies before the merger was not one of buyer and seller (a vertical merger) or direct competitor (horizontal merger). The fact that a given merger is of a conglomerate nature has no effect per se on the antitrust consequences of the union: "All mergers are within the reach of § 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate or other." *Clorox*, at 577, 87 S.Ct. at 1229. Indeed, one of the main purposes of the 1950 amendment of § 7 was to make clear that the section was not applicable only to horizontal mergers, but "to all types of mergers and acquisitions, vertical and conglomerate as well as horizontal, which have the specified effects of substantially lessening competition * * * or tending to create a monopoly." H.Rep.No.1191, 81st Cong., 1st Sess. II (1949).

However, while a merger is not free of antitrust consequences because it is conglomerate, few such mergers have been contested by the government. Challenges to the kind of acquisition involved in this case lie in a "comparatively new field of economic adjudication," *Clorox*, at 582, 87 S.Ct. at 1232 (Justice Harlan concurring), a field troubling to both courts and the Commission.

The problem in analyzing conglomerate mergers is that the effect of such a merger on the relevant market is not so readily apparent as is the case with vertical and horizontal mergers. In part, this problem arises from the fact that the term "conglomerate merger" encompasses such a variety of combinations. As suggested by then-professor Turner, the class of mergers included in this term

" * * * ranges from the pure conglomerate, in which there are no discernible economic relationships between the businesses of the acquiring and the acquired firm, through a variety of what may be called mixed conglomerates, involving horizontal or vertical economic relationships * *.

Mixed conglomerates include acquisition of a firm producing the same product as the acquirer but selling it in a different geographic market, and acquisition of a company manufacturing a different product which is nevertheless related to a product or products of the acquiring firm because it can be produced with much the same facilities, sold through the same distribution channels, or made a part of the same research and development efforts." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv. L.Rev. 1313, 1315 (1965).

While antitrust consequences might attach to a "pure" conglomerate merger, it is more likely that "mixed" conglomerates with their attendant horizontal or vertical relationships will come under attack as involving proscribed alterations in the structure of a given relevant market. The instant case is an example of a mixed conglomerate merger in that the acquired product line, S.O.S. soap pads, "fits" quite closely into the overall marketing program utilized by G.F. The Commission labeled this merger a "product extension merger" which is to say a " * * * merger that may enable significant integration in the production, distribution or marketing activities of the merging firms." We quite agree with this characterization of the instant merger because, as found by the Commission, the acquired product line was easily integrated into the marketing program employed by G.F. for its packaged food products: common to the marketing of all these products are high-consumer-oriented advertising budgets; the same distributional outlets, primarily grocery stores and supermarkets; and the same ultimate consumer group, the housewife.

Agreeing as we do with this characterization of the merger, it is still necessary to determine whether the Commission had substantial evidence to support its prediction that the merger would probably substantially lessen competition. This determination is necessary because we do not read *Clorox* as proscribing, per se, all mergers labeled "product extension mergers."

As summarized by the Commission, the conclusion that G.F.'s acquisition of S.O.S. would in fact substantially lessen competition in the steel wool soap pad market was based on its

" * * * finding that respondent's acquisition of S.O.S. has raised to virtually insurmountable heights entry barriers which were already high, that the presence of General Foods in the market has changed the steel wool pad market which prior to the merger consisted of two substantially equal-sized companies and several smaller firms to one in which S.O.S. is now dominant, and finally that the substitution of General Foods for S.O.S. will depress rather than enhance the competitive vitality of the market and will paralyze any incentive to compete which might otherwise have existed. The fact that these high entry barriers to potential entrants and the impairment of the competitive vitality of the market arises in part because of the impact which General Foods' advertising, promotional and distributional resources had on potential and actual competitors in this market did not make its acquisition any less anticompetitive."

Although G.F. asserts that its acquisition of S.O.S. did not raise entry barriers, the Commission could reasonably conclude the contrary on the basis of the record before it. The Commission found that before the merger, the steel soap pad market was highly concentrated, and although the products of the competitors were functionally identical, consumer preference for the S.O.S. and Brillo products had been generated through extensive advertising and a long history of industry dominance. Thus the smaller companies producing less well-known brands and potential producers of new brands could not make significant market penetrations without engaging in heavy expenditures for advertising and promotions. After the merger of S.O.S. and G.F., the existing competitors and such potential competitors as existed faced an even more formidable opponent. G.F. was able to advertise and promote S.O.S. less expensively than the pre-merger S.O.S. Company, especially because of the television discounts available to G.F. Moreover, after the merger, S.O.S. could and did induce potential customers to purchase its soap pads by offering them discounts based on pooled purchases from various divisions of G.F. The Commission also reasonably concluded that G.F. was in a position vis-a-vis the retailers that made it highly likely that G.F. would be able to obtain advantages in the display or marketing of S.O.S. which were not available to the pre-merger company, nor then available to S.O.S.' competitors. These factors are adequate to support the Commission's finding that factual and psychological barriers to entry were substantially heightened by this merger.

The Commission also found that the merger had an adverse impact on the structure of the soap pad industry. Comparing the situation with that presented in *Clorox*, the Commission found that the impact of G.F.'s acquisition of S.O.S. was of greater competitive significance than Procter & Gamble's acquisition of Clorox since G.F.'s entrance into the soap pad market had a more pronounced effect on the competitive structure of the industry. In *Clorox*, Procter & Gamble acquired the overwhelmingly dominant company in the liquid bleach industry, the only nationwide seller that accounted for almost half of the national sales and whose nearest competitor accounted for only 15% of the market. Highly significant in *Clorox* was the fact that the Commission found that Procter & Gamble was the most likely prospective entrant and exerted an influence on the market as a potential competitor.

The Commission found that while the merger in *Clorox* rendered the dominant company in an industry even more powerful, G.F.'s acquisition of S.O.S. "eliminated the competitive balance between S.O.S. and Brillo," the two dominant members of the industry, and left S.O.S. with "decisive competitive advantages over Brillo." This disproportionate strength would contribute to and increase concentration in the industry. Though not well articulated, there is merit to the Commission's finding. While it is not

the aim of antitrust policy to merely preserve "competitive balance" per se, it assuredly is the aim of such policy to preserve whatever competition exists in a given industry, even if such competition be of an oligopolistic nature.

G.F. also challenges the Commission's findings as inconsistent with the post-acquisition history of the merger, asserting that the effect of the merger was really to revitalize the then-stagnant competition between S.O.S. and Brillo. As pointed out by appellant, post-acquisition evidence shows that S.O.S. lost ground to Brillo during the initial period following the merger. Subsequently, through an aggressive, imaginative campaign directed especially against Brillo's dominant position in the lucrative New York market, S.O.S. regained its position and, at the time the record closed below, had increased substantially its share of the market over its pre-merger proportion. The problem here is that the post-acquisition evidence is inconclusive and susceptible of diverse inferences, including inferences supporting the Commission's position. Indeed, the post-acquisition history indicates that Brillo has merged with the Purex Corporation, Ltd. While the Commission did not attempt to evaluate the effect that this merger would have in the steel soap pad market, it did note that the likelihood that a given merger will trigger other mergers and give impetus to further concentration is a relevant factor in assessing the anticompetitive effect of that merger. Brown Shoe Co. v. United States, 370 U.S. 294, 343–344, 82 S.Ct. 1502 (1962).

G.F. has also argued that one of the central aspects of the *Clorox* case, the elimination of the acquiring firm as a potential competitor, is entirely missing in this case, and that the record does not support the finding that the market structure of the steel wool soap pad industry was drastically altered through any loss of potential competition. It is true that G.F. was not a potential competitor lurking on the fringe of the soap pad market and exerting an effect on the actions of the actual competitors. However, we do not read *Clorox* as holding that "product extension" mergers must involve the elimination of this type of potential competition to run afoul of the Clayton Act.

Moreover, the Commission could reasonably conclude that the potential competition was adversely affected by G.F.'s entrance into the market through the acquisition of S.O.S. because the entry of such a large, well-financed, aggressive competitor would necessarily hamper whatever effect potential competition had in the pre-merger market. This result follows because the threat of entrance into a given market by potential competitors is reduced to the extent that entry barriers are raised. Thus the Commission's finding that potential competition was reduced by the instant merger is based on its finding that the substitution of G.F. for the smaller S.O.S. Company increased the difficulty of entering the market, and the reduction of potential competition was a predictable consequence.

The Commission could reasonably conclude that the entry of G.F. would have a depressing effect on the quality of competition in the market. As in *Clorox,* the degree of market power enjoyed by G.F., including the power to take retaliatory action against any aggressive competition by smaller competitors, made it likely that the market would become an even more rigid oligopoly. It is no answer to contend that the market was oligopolistic before the entrance of G.F. because the Commission could reasonably conclude that under G.F.'s eventual dominance, the market would become even less competitive. Moreover, the immediate post-acquisition flurry of competition between Brillo and S.O.S.—which apparently lead to S.O.S.' eventual emergence with a greater market share, and the merger of Brillo with Purex—certainly does not compel the conclusion that the market will become competitive.

█ Thus we conclude that the Commission was justified in finding that G.F.'s acquisition of the S.O.S. Company would substantially lessen competition in the steel wool soap pad market, and in

adopting the order entered by the hearing examiner requiring G.F. to divest itself of the S.O.S. assets found to have been acquired in violation of § 7. United States v. E. I. DuPont De Nemours & Co., 366 U.S. 316, 328–331, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961).

The order of the Commission will be affirmed and enforced. 15 U.S.C. § 21 (c) (1964).