Warren SMITH

v.

Wingate WHITE, Warden, Louisiana State
Penitentiary, Angola, Louisiana, and
the State of Louisiana.

Misc. No. 963.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

March 29, 1968.

Charles E. Pilcher, Baton Rouge, La.,
for petitioner.

Jack P. F. Gremillion, Atty. Gen. of
Louisiana, Teddy W. Airhart, Jr., Asst.
Atty. Gen. of Louisiana, Baton Rouge,
La., for respondents.

WEST, Chief Judge:

Petitioner, Warren Smith, is presently
incarcerated in the Louisiana State Pen-
itentiary at Angola, Louisiana, where he
is serving a five year sentence for vio-
lation of LSA R.S. 40:962 (unlawful
possession of narcotic drugs). Pursuant
to a bill of information filed by the Dis-
trict Attorney for the Parish of Or-
leans, petitioner was tried by a jury and
found guilty as charged on May 18,
1966. After denial of his application
for writs of certiorari and review by the
Louisiana Supreme Court, and after de-
nial of his petition for writ of habeas
corpus directed to the Criminal District
Court for the Parish of Orleans, peti-
tioner focused his attentions upon this
Court. In the present petition for is-
suance of a writ of habeas corpus, he
attacks his conviction as constitutionally
invalid on the theory that he was ar-
rested without probable cause and con-
victed with the use of evidence produced
as a result of an illegal search and
seizure.

This Court appointed Charles E. Pil-
cher, Esq., attorney at law, to represent
petitioner herein and a full evidentiary
hearing was held on December 15, 1967.
During the course of the hearing, peti-
tioner abandoned his claim of illegal ar-
rest, which this Court agrees was with-
out merit, and based his application sole-
ly on the contention that he was the
victim of an illegal search and seizure.
After a careful review of the evidence
adduced at the hearing, and after a
thorough study of the pertinent author-
ities, it is the opinion of this Court that
petitioner's contentions are without mer-
it.

The pertinent facts may be simply
stated. On the evening of October 14,
1965, in the City of New Orleans, Loui-
siana, petitioner and his brother were
traveling in a green 1949 Ford panel
truck on Washington Avenue, heading
towards Lake Ponchartrain. They
passed an unmarked police car occupied

by a plain-clothes officer named Dewey B. Varnado, who was traveling on Washington Avenue in the opposite direction. Upon noticing that the truck lacked a license plate, Officer Varnado immediately made a "U"-turn and began pursuit. The truck at this point passed a bus at a high rate of speed and then made a right turn. Then followed a series of turns and maneuvers taken in what appeared to be an obvious attempt to elude the officer. The chase which followed spanned a distance of some ten blocks at speeds ranging from thirty-five to forty miles per hour. Petitioner was finally halted near the corner of First and Willow Streets. As he approached petitioner, the officer noted that the man appeared to be unusually agitated. He stuttered: "I don't have any driver's license. I was trying to get away because I don't have any driver's license." Officer Varnado then informed Smith that he was under arrest for not having the required driver's license. The officer then walked around to the rear of the truck, followed by Smith, in order to verify his original observation that the vehicle bore no license plate. The back doors of the truck were open slightly and tied in this position. There were several long boards protruding from the rear. There was no visible license plate on the truck nor was there any evidence of one having been applied for. The contents of the rear portion of the truck were clearly visible to the officer standing behind the truck due to the open doors. Officer Varnado casually glanced into the interior and observed a small cylindrical package wrapped in brown paper which was resting on top of one of the planks just inside the door. When asked what the package contained, petitioner hastily replied: "That's not mine, that's not mine, that's not mine." Varnado, an officer experienced in the handling of narcotics cases, had seen such packages many times before, and based upon his experience in handling such cases, he had reason to believe that the package contained narcotics or narcotic paraphernalia. He reached into the truck's interior, picked up the object and opened it. The contents included a small piece of white paper, a bottle top which was blackened on one side, a medicine dropper with a black rubber bulb on one end, and a 26 gauge hypodermic needle. Thus the officer's suspicions were confirmed. Petitioner insisted that he had never seen the package before in his life, although he admitted that the truck belonged to him. Officer Varnado informed him that he would be charged with possession of narcotics as well as with failure to have the proper driver's and registration licenses. The officer further informed him of his constitutional rights (petitioner does not deny this) and then asked again about the ownership of the package. Petitioner finally admitted that the package was his, that he had recently been released from prison on probation, and that he had been using narcotics occasionally. Smith also stated that his brother, Jerald, was a juvenile and that he knew nothing of the package or of its contents.

In his deposition, Officer Varnado explained that the package in question was similar in size and shape to many others he had seen in the possession of narcotics offenders that his work brought him into contact with, and that this is a customary means of carrying the paraphernalia used to administer the illicit drugs. Further, the officer noted that the small package was perched on top of one of several planks protruding from the rear of the vehicle. "There was no way," said the officer, "that this package could have ridden there at that speed [during the chase]. It would have had to fall down through the cracks or roll out of the back of the truck." Thus the officer concluded that the little "kit" was thrown or placed there after Smith stopped the vehicle, just before he, Varnado, approached. At no time did Officer Varnado open the doors of the truck, nor did he at any time enter it. The package was in plain view, some eighteen to twenty-four inches inside the

door. "It was just there like a sore thumb. At a glance you know it just didn't belong there. After the route he had taken, the path he traveled, it just didn't belong there," said the officer. Officer Varnado also testified that petitioner was extremely nervous and that twice he had to call him to keep him from walking away.

Petitioner, in his brief, contends that he was on his way to purchase some tires for his truck when he was stopped by Officer Varnado and placed under arrest "without a warrant for arrest of any sort." He also claims that he and his brother were searched for weapons and then the truck was searched thoroughly. After having had an opportunity to observe petitioner's demeanor and after carefully considering the evidence, this Court finds that it simply cannot believe what the petitioner says. The evidence overwhelmingly indicates that the chain of events more likely occurred as related by Officer Varnado than as contended by petitioner.

■ The United States Constitution provides, in the Fourth Amendment, that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

It has long been the rule that a search and seizure, made as an incident to a lawful arrest, will be clothed with the mantle of legality. See Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), and United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). However there now seems to be a difference of opinion as to the validity of this rule when applied to searches made as an incident to *traffic* arrests. In the recent case of Amador-

Gonzalez v. United States, 5 Cir., January 10, 1968, 391 F.2d 308, the Court (Judge Wisdom writing for the majority) discusses at length the problems attendant to such arrests. The following language from the Supreme Court decision in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) is cited in *Amador-Gonzalez:*

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

The Fifth Circuit then states that if the restrictions of the Amendment on official intrusions into the privacy of citizens are to have any meaning, then all courts must carefully examine searches and seizures which are alleged to come within the recognized exceptions to the requirement of having a warrant.

The *Amador-Gonzalez* case dealt with an arrest in a narcotics smuggling case arising in El Paso, Texas. In that case, narcotics agents had "staked-out" the automobile of two known narcotics smugglers who were suspected of having engaged in a conspiracy to bring a quantity of narcotics into the United States. Defendant Gonzalez was observed circling the block in an apparent attempt to rendezvous with the owners of the automobile. After watching defendant for some twenty or thirty minutes, the officers arrested him for repeated violations of the El Paso traffic laws, i. e., speeding, making an improper left turn, failure to have a driver's license, etc. The officers admitted later that this

was only a pretext for the search of defendant's car for narcotics. Gonzalez' conviction was reversed on this ground. Judge Wisdom, however, would state a more sweeping rule:

"I would go further. I would hold that, pretext or no pretext, a lawful arrest of an automobile driver for a traffic offense provides no lawful predicate for the search of the driver or his car—absent special circumstances." Amador-Gonzalez v. United States, (CA 5, Jan. 10, 1968, 391 F.2d 315.)

However, Judges Coleman and Godbold, in concurring opinions, state that the issue of the validity of searches and seizures incidental to traffic arrests in general was not reached. They ruled that once it was determined that the arrest in question was but a pretext for a search of the automobile, then it was constitutionally invalid, period, and that the above statement of Judge Wisdom's is dicta.

 But most important to the present case is the exception to the general rule called the "plain-sight" exception, established by the decision of the Supreme Court in Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The Court, in discussing the rule, has this to say:

"This rule permits an officer to investigate and seize property visible to him without a search, if he is lawfully in a position enabling him to see the object seized. In our recent decision in Nunez v. United States, 5 Cir. 1967, 370 F.2d 538, local officers had stopped an automobile when the driver had appeared to be driving recklessly, and had discovered a sawed-off shotgun, the possession of which formed the basis for the federal prosecution. In that case the court found that 'there was ample evidence to support that conclusion that the weapon involved was clearly visible to the officers without a detailed search of the automobile.'" 370 F.2d at 539.

Thus it was found that the seizure of books, ledgers, bills of account, etc. was legal when they were in plain view to the officer who was standing in a place where he had a legal right to be, and when he had probable cause to believe that they were used in the commission of a criminal offense. The same result must follow in the case at bar. Officer Varnado saw, without searching therefor, the familiar looking package, observed petitioner's strange behavior, and put two and two together. He had reasonable cause to believe an offense had been committed. This cannot, by any interpretation of the facts, be construed as an illegal search and seizure. Petitioner's application for issuance of a writ of habeas corpus must be denied. Judgment will be entered accordingly.