**UNITED STATES of America,**
**Plaintiff,**

**v.**

**WILSON SPORTING GOODS CO. and Nissen Corporation, Defendants.**

**No. 68 C 549.**

United States District Court
N. D. Illinois, E. D.

July 2, 1968.

Joel Davidow, Atty. Antitrust Division, Washington, D. C., John E. Sarbaugh, Kenneth Hanson, Attys., Antitrust Division, Chicago, Ill., for Government.

Howard Adler, Jr., Bergson, Borkland, Margolis & Adler, Washington, D. C., Richard Decker, Lord, Bissell & Brook, Chicago, Ill., Haven Y. Simmons, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, Iowa, for defendants.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### Plaintiff's Motion for Preliminary Injunction

The Government brings this action under Section 15 of the Clayton Act, 15 U.S.C. Sec. 25, to enjoin a proposed merger between the defendant Wilson Sporting Goods Company (hereinafter "Wilson"), a subsidiary of Ling-Temco-Vought, Inc., (hereinafter "LTV"), and the defendant Nissen Corporation (hereinafter "Nissen"), on the ground that it would violate Section 7 of the Clayton Act, as amended by the Celler-

Kefauver Amendment, 64 Stat. 1125, 15 U.S.C. Sec. 18.[1]

On March 28, 1968, we issued a temporary restraining order temporarily preventing the companies from consummating the proposed merger, but allowing the respective shareholders, who were attending meetings to vote on the proposal that very day, to cast their votes. The merger was approved, but has been held in abeyance pursuant to our order, and pending a decision on the Government's motion for a preliminary injunction, with which this opinion deals.

At the hearings on the motion for preliminary injunction, both sides presented live testimony amounting to 350 transcript pages. Additional depositions were subsequently taken and made part of the record. The parties have presented quite elaborate briefs and documentary exhibits, and the Court has had the benefit of enlightening closing arguments, made after the papers and briefs were submitted. Hence, although further discovery remains to be completed, we have before us a substantial record upon which to base a ruling on the pending motion.

■ In order to justify the issuance of a preliminary injunction, we must, at the least, find that there is a reasonable probability that the Government will prevail at a trial on the merits.[2] As will be discussed later, other factors should be considered in deciding whether to issue a preliminary injunction, but they are generally subsidiary to the merits of the controversy.[3] Hence, our initial inquiry must be addressed to the issue posed by Section 7—will the proposed acquisition tend to lessen competition in the line of commerce under consideration?

The Nissen Corporation, with headquarters in Cedar Rapids, Iowa, is the leading manufacturer and seller of gymnastic equipment in the country. It manufactures and sells a full line of gymnastic equipment, including, as illustrative examples, such items as parallel bars, sidehorses, horizontal bars, balance beams, rings, trampolines, and gymnastic apparel. It manufactures these products at its plant in Cedar Rapids. In addition, it owns or is affiliated with plants in England and Japan. During the past few years, in addition to gymnastic equipment, it has begun to manufacture and sell such other items as gym mats, table tennis tables, volleyball equipment and basketball backstops. And it apparently intends to soon introduce a line of track and field equipment that George Nissen, its founder, president, and majority stockholder believes, will be better than anything now on the market. Mr. Nissen has developed a company known as the highest quality manufacturer in the gymnastic equipment industry, with sales in 1967 of $4,207,234.

Ling-Temco-Vought, Inc., the parent of Wilson, is a giant conglomerate company with 1967 sales of approximately

1. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

2. United States v. Chrysler Corp., 232 F.Supp. 651, 657 (D.N.J.1964); United States v. Aluminium Ltd., 5 Trade Reg. Rep. (1965 Trade Cases) Par. 71,366 at 80,571 (D.N.J.1965).

3. See page 567 et seq., infra. United States v. Penick & Ford, 242 F.Supp. 518 (D.N.J.1965), affirmed (3d Cir. 1965); United States v. Brown Shoe Co., 1956 Trade Cas. 71,109, 71,116 (E.D. Mo.); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 (2d Cir. 1953); United States v. Parents Magazine Enterprises, 1962 Trade Cas. 76,757 (N.D.Ill.1962); Note, Preliminary Relief for the Government Under Section 7 of the Clayton Act, 79 Harv.L.Rev. 391, 398–400 (1965).

$1.8 billion. Wilson is engaged in the business of manufacturing and selling golf, baseball, tennis, football, basketball, and other sporting goods, apparel and accessories, as well as toys and molded plastic products. Wilson's product line includes over 8,000 items, and 70% of its sales consist of products of its own manufacture. Wilson has 13 manufacturing plants in the United States, and has sales branches in England, Germany, Hong Kong and Japan. In 1967, it had net sales of $89,066,000. It is the largest manufacturer and seller of a broad line of sporting goods in the United States. It is one of the most respected names in the athletic goods industry, and in a number of products, including tennis equipment, it is the leading seller in the country.

Wilson does not manufacture or sell gymnastic equipment. It hopes to enter the market via this merger. Both the defendant companies, however, sell such items as gym mats, wainscotting, sweat suits, basketball backboards, volleyball equipment, and table tennis tables. These items concededly are relatively minor items for both Nissen and Wilson at this time, and Wilson does not manufacture most of them itself, but purchases them for resale.

A Government survey prepared in connection with this case, tabulated the 1967 sales figures of 23 manufacturers of gymnastic equipment. The information was collected by way of voluntary disclosure and subpoena. The companies range from Nissen, the leader, to K-Sports Co., with 1967 sales of gymnastic equipment totaling only $2000. The survey indicates initially that the consumer market for gymnastic equipment, the majority of which consists of institutional purchasers, is rapidly expanding.[4] For example, Nissen's sales increased over 30% in the period 1965–1967. Nevertheless, because of the increased demand for gymnastic equipment, its share of the industry's total sales has fallen from about 38% in 1965 to 32% in 1967.

Secondly, the survey indicates that the industry is quite concentrated. Although figures were received for 23 companies, including all of the significant ones, it appears that the top four companies account for over 60% of the total industry sales reflected in the survey, and the top nine companies for over 97% thereof.[5]

In addition, the concentration reflected by the above figures may be somewhat understated. That is because only four companies are able to produce products that conform to Olympic or National Collegiate Athletic Association (NCAA) standards.[6] Only such equip-

---

4. Total sales in 1965 for the companies listed were slightly under $8 million. In 1967, total sales were almost $13 million, an increase in two years of over 60%. (Govt.Exh. 25.) The totals do not include imports which, Mr. Nissen testified, amount to more than 5% of the market.

5. Nissen, as above stated, accounts for over 32% of industry sales, while its closest competitor American Athletic Equipment Co., accounts for only about 12%. The breakdown of the remainder of the companies is as follows:

| | |
|---|---|
| Atlas Athletic Equipment Co. . | 8.79% |
| Canvas Products Co. (Atlas' parent company) . . . . . . . . . . . | 1.05% |
| Program Aids Company . . . . . . | 9.35% |
| Premier Products Co. . . . . . . . . | 8.26% |
| Aalco Manufacturing Co. . . . . . . | 8.22% |
| Gym Master Co. . . . . . . . . . . . . | 6.87% |
| Everlast Sporting Goods Mfg. Co. . . . . . . . . . . . . . . . . . . . . . | 6.01% |
| Porter-Leavitt Co. . . . . . . . . . . . | 4.34%, |
| Star Division of V & S Industries, Inc. . . . . . . . . . . . . . . . . | .69% |
| Sidlinger Products Co., . . . . . . | .50% |
| Stadium Products . . . . . . . . . . . . | .46% |
| Gymnastic Supply Co. . . . . . . . . | .29% |
| Mac Levy Products Corp. . . . . | .23% |
| Leflar Enterprises Inc. . . . . . . | .19% |
| Arnold Health Equipment Co. . | .12% |
| Gared Corp. . . . . . . . . . . . . . . . . | .12% |
| Jerry Krawitz . . . . . . . . . . . . . . | .10% |
| Jayfro Athletic Supply Co. . . . . | .05% |
| R. E. Austin & Son . . . . . . . . | .03% |
| Gilmore Engineering & Mfg. . . | .015% |
| K–Sports Co. . . . . . . . . . . . . . . | .015% |

6. The four companies are Nissen, American Athletic Equipment Company, the No. 2 company with almost 12% of total industry sales of all products, Gym Master Co., the 7th ranked company with

ment, which must comply with rigid specifications, may be used at sanctioned meets.

Although the survey's figures include a composite of the sales of both Olympic and non-Olympic equipment, no figures were submitted to indicate the total sales of Olympic equipment relative to the remainder of the industry's products. But at the closing argument, defense counsel did not challenge the Government counsel's remark that Nissen's leading position is even more powerful in percentage terms with respect to Olympic equipment, and the market for these items even more concentrated than the market generally. Furthermore, many of the smaller companies do not sell nationally, and do not offer a full line of gymnastic equipment, and of trampolines.[7] Hence, they constitute competition to Nissen only regionally, and with respect to certain non-Olympic equipment.

Nissen's respected position in the industry is reflected in part by its quality products and in part by the fact that it can sell its products at a dealer's mark-up of only 15%, while its competitors offer a 50% spread to the dealers. To some degree, although the precise amount is indeterminate, the reason for Nissen's smaller margin to the dealer is accounted for by its sales technique. Whereas its competitors generally sell through a dealer who expends most of the effort required to make the sale, Nissen boasts an eight man sales force which usually pre-sells its products to the ultimate consumer—the coach or athletic director of an institution in most instances. The order is then placed through a dealer who receives 15% for his trouble, but who is re-sponsible for little of the actual selling effort. In addition, Nissen's products are considerably higher priced, in many instances, and it appears that Nissen's philosophy is to retain its current high profit margins at the expense of even higher volume and a larger share of the market.

Wilson is an aggressive company which intends to expand into the lucrative gymnastic equipment field, preferably by this merger. Its projected plans also call for expansion by merger into the production of sporting goods equipment such as archery equipment, fishing tackle, skiing equipment, and rubber sporting goods products such as balls.[8] It has been attracted to Nissen by the expanding sales market for gymnastic equipment, Nissen's record of leadership and innovation in the industry, its financial position, and perhaps most of all by the opportunity to retain George Nissen as operating head of the business. Wilson represents that it intends to maintain Nissen as a separate corporation, with the same management, and does not intend to intermingle any of its facilities, sales operations, or other company functions with those of Wilson. In effect, according to Wilson, it intends to hold Nissen simply as an attractive investment. The Merger Agreement contained express acknowledgment of the intent to transfer the present Nissen assets to a new and separate subsidiary corporation, and the proxy statement sent to stockholders of both companies acknowledged the intention to maintain Nissen as a separate corporation and "to continue to conduct substantially the same business as is now conducted by Nissen under the same

---

about 7% of total industry sales, and Porter-Leavitt Co., the 8th ranked company with about 4% of total industry sales.

7. There is a distinction between "classical gymnastic apparatus," and other gymnastic apparatus. "Classical" apparatus was defined by Mr. Nissen at the hearing to mean the "competitive" gymnastic ap-paratus used in Olympic or other competition. Even though trampolines are used in NCAA meets, they are not used in Olympic or foreign meets and are not considered to be "classical" apparatus. (Tr. 16–17). Thus the distinction in the text between gymnastic equipment and trampolines.

8. Govt. Exh. 13, pp. 47–49.

name, as a wholly owned subsidiary of Wilson." [9]

We believe this proposed merger quite appropriately should be denominated a "product-extension" merger, a term officially coined in the Federal Trade Commission opinion in Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 570, 577–578, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (hereinafter "Clorox"). That is because Nissen manufactures a different product than Wilson, but one which is related to the sporting goods family produced by Wilson, and the merger "may enable significant integration in the production, distribution or marketing activities of the merging firms." General Foods Corporation v. Federal Trade Commission, 386 F.2d 936, 944 (3d Cir. 1967) (hereinafter "General Foods"), citing the Commission's opinion in Clorox.[10] Wilson's disclaimer of intention to integrate the two companies' operations does not negative the obvious availability of such a course if Wilson deemed it prudent.

In addition, this merger has some horizontal characteristics inasmuch as both companies manufacture and/or sell a few of the same products, even though they constitute a small percentage of total sales.

As the Supreme Court recognized in Clorox, it does not particularly aid analysis to discuss mergers in terms of their conventional labels as horizontal, vertical or conglomerate (386 U.S. at 570, 87 S.Ct. 1224). What is significant is the effect of the proposed merger upon the market structure of the relevant industries, and whether the merger will tend to lessen competition in the relevant market. Indeed, the governing facts in litigation involving a conglomerate merger are usually different from those in a horizontal or vertical situation, and their analysis required emphasis upon different market effects. Whereas the Supreme Court has fashioned virtually a *per se* rule based upon the extent of the relative market shares of the merging firms, in considering horizontal mergers,[11] such an analysis will not do when considering a conglomerate merger, simply because the merging companies are not direct competitors in the same markets. Turner, supra at 1315–1316. Cf. F.T.C. v. Procter & Gamble, supra, 386 U.S. at 589–590, 594, 87 S.Ct. 1224 (Harlan, J. concurring.)[12]

---

9. Def. Exh. 15, pp. 4, 28.

10. Professor Turner described this type of merger as a "mixed conglomerate," a category also including the merger of firms producing the same product, but in a different geographic market. See Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L. Rev. 1313, 1315 (1965) (hereinafter cited as Turner).

11. See e.g., United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. Aluminum Co. of America (Rome Cable), 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L. Ed.2d 555 (1966); United States v. Pabst Brewing Co., 384 U.S. 546, 86 S. Ct. 1665, 16 L.Ed.2d 765 (1966). Cf. Clorox, supra 386 U.S. at 594–595, 87 S.Ct. 1224 (Harlan, J. concurring).

12. That is not to say that the market shares of the parties to a conglomerate merger in their respective markets are not relevant. Indeed, the opinion of the Federal Trade Commission in Clorox relied heavily upon the dominant positions of Procter & Gamble and Clorox in their respective markets in reaching conclusions as to the type of market structure and conditions of entry extant in the liquid bleach industry. And much of our discussion of the instant merger, infra, will turn on the market share currently held by Nissen and the relative size of a Wilson-Nissen combine vis-a-vis its competitors in the industry. But competition is not directly lessened in a conglomerate merger, as it is in a horizontal merger where the number of present, as distinguished from potential, competitors is reduced.

Professor Turner summarized the need for varying analysis of different types of mergers, as follows: (Turner, supra at 1320–1322)

"* * * A crude comparison of the three categories of mergers—horizontal,

The author of the Commission's exhaustive opinion in *Clorox* has suggested, in a recent paper commenting upon the *Clorox* case, the vital importance of weighing the effects of a conglomerate merger upon the condition of entry by a process of economic analysis of the market structure. Elman, Clorox and Conglomerate Mergers, 36 A.B.A. Antitrust L. J. 23, 27–28 (1967). The shift in antitrust analysis to an approach based upon considerations of market structure rather than considerations of "performance" or "conduct," is discussed in Mueller, The New Antitrust; A 'Structural' Approach, 1 Antitrust L. & E. Rev. 87 (1967).

As Justice Harlan recognized while concurring in *Clorox*, mergers of the instant type are "becoming increasingly important as large corporations seek to diversify their operations,"[13] but pose exceedingly difficult problems for the lower courts, both because of the serious economic queries which they pose, and because the pertinent issues have not as yet been considered extensively by the Supreme Court. The only Supreme Court case to deal with a conglomerate merger was *Clorox* and the only major Court of Appeals decision thereafter has been General Foods Corp. v. F. T. C., 386 F.2d 936 (3d Cir. 1967), cert. denied 391 U.S. 919, 88 S. Ct. 1805, 20 L.Ed.2d 657, May 20, 1968. Few such mergers have as yet been challenged by the Justice Department. In part, the reason is the relatively recent

vertical and conglomerate—will illustrate some of the possibilities. First, would it seem reasonable to apply more restrictive rules to horizontal mergers than to conglomerates generally? The answer appears to be 'yes'. Anticompetitive consequences seem more likely to follow a horizontal merger of two substantial competitors in the same market than a conglomerate merger of two companies that are substantial in their respective separate product markets. The former arrangement removes a substantial competitor as an independent decision-making force in the market; the latter simply substitutes one firm for another, leaving industry concentration as it was. Moreover, it is not likely that forbidding the horizontal merger would thwart the realization of significant economies, if such possibilities are present, or of new and significant competitive pressure from an aggressive, efficient management. "The barriers to growth through internal expansion by a company already in the market are less formidable than the barriers to entry by an outsider—there is no problem of lack of familiarity with products, techniques, or markets, and no need to establish consumer confidence in the quality of the product the company puts out. In short, a firm with growth or expansion opportunities in its own field, that is already exerting competitive pressures, is likely to resort to internal expansion if the merger route to growth is closed. There is the offsetting consideration, or argument, that a company already in the industry is ideally suited to put the assets of the acquired company to their best use. But this is by no means certain; the newcomer may bring fresh ideas to a field in which conventional approaches have dulled initiatives. On balance, therefore, it seems prima facie a sound proposition that whatever antimerger standards are adopted, they should generally be more severe for horizontal than for conglomerate mergers.

\* \* \* \* \*

"Thus, a quick survey of the three broad categories of mergers would suggest the following relative hierarchy of rules: hardest on horizontal mergers, easier on vertical, and least severe on conglomerates."

13. 386 U.S. at 582, 87 S.Ct. at 1232. Conglomerate mergers of the "product extension" type will probably be more frequent than "pure" conglomerate mergers. Professor Turner stated in that regard: (Turner, supra at 1315)

"Conglomerate acquisitions involving no significant economic relationships have been relatively infrequent as compared to those that 'fit' the operations of the acquiree in some tangible respect. Companies looking for new lines of business tend to buy into those fields with which they have at least some degree of familiarity, and where economies and efficiencies from assimilation are at least possible. Nevertheless, acquisitions in which there are no, or virtually no, economic relationships other than financial do occur, as in the case of a firm seeking to diversify its product line in order to hedge against the risks of having all its eggs in one basket."

enthusiasm for "conglomerates" in the business community, and the emergence in a modern antitrust context of the giant conglomerate company.[14] But perhaps of even greater significance is that the effect of a conglomerate merger "on the relevant market is not so readily apparent as is the case with vertical and horizontal mergers." General Foods v. F. T. C., 386 F.2d 936, 944 (3d Cir. 1967).

██ The starting point in judging this merger, as with any other, regardless of its characterization, is the statute. Section 7 prohibits any merger " * * * where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition * * *." (15 U.S.C. Sec. 18). While the "mere possibility" that competition will be lessened is not sufficient,[15] neither is it necessary to demonstrate or prove actual restraints on competition in order to invalidate a merger. The correct test was stated in *Clorox*: (386 U.S. at 577, 87 S.Ct. at 1229)

"Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. See Brown Shoe Co. v. United States, 370 U.S. 294, [82 S.Ct. 1502, 8 L.Ed. 2d 510;] United States v. Philadelphia National Bank, 374 U.S. 321, [83 S.Ct. 1715, 10 L.Ed.2d 915.] The section can deal only with probabilities, not with certainties. Brown Shoe Co. v. United States, supra, [370 U.S.] at 323, [82 S.Ct. at 1522;] United States v. Penn-Olin Chemical Co., 378 U.S. 158, [84 S.Ct. 1710, 12 L.Ed.2d 775.] And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before Section 7 can be called into play. If the enforcement of Section 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated."

As was pointed out in *General Foods*, 386 F.2d at 944, the 1950 amendments

14. The merger guidelines issued on May 30, 1968, by the Department of Justice, contain rather elaborate formulas for determining the Antitrust Division's position on most horizontal and vertical mergers. With regard to conglomerate mergers, however, fairly specific structural guidelines are elucidated only with regard to mergers involving potential entrants and mergers creating a danger of reciprocity. Less specific rules are stated with respect to conglomerate mergers which serve to entrench the market power of the acquired firm or raise barriers to entry. But the guidelines conclude by leaving wide open the Department's freedom of action in future conglomerate situations, and for the following reasons: (at p. 26)

"Generally speaking, the conglomerate merger area involves novel problems that have not yet been subjected to as extensive or sustained analysis as those presented by horizontal and vertical mergers. It is for this reason that the Department's enforcement policy regarding the foregoing category of conglomerate mergers cannot be set forth with greater specificity. Moreover, the conglomerate merger field as a whole is one in which the Department considers it necessary, to a greater extent than with horizontal and vertical mergers, to carry on a continuous analysis and study of the ways in which mergers may have significant anticompetitive consequences in circumstances beyond those covered by these guidelines. For example, the Department has used Section 7 to prevent mergers which may diminish long-run possibilities of enhanced competition resulting from technological developments that may increase interproduct competition between industries whose products are presently relatively imperfect substitutes. Other areas where enforcement action will be deemed appropriate may also be identified on a case-by-case basis; and as the result of continuous analysis and study the Department may identify other categories of mergers that can be the subject of specific guidelines."

15. United States v. E. I. DuPont De Nemours Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

which broadened the coverage of Section 7 were designed, inter alia, to make clear that the statute extended to conglomerate mergers as well as to horizontal and vertical mergers. H.Rep.No. 1191, 81st Cong. 1st Sess. II (1949).

Let us now consider the application of the statute to the facts at hand. There is no dispute between the parties regarding the relevant line of commerce or the section of the country involved. the relevant geographical market is agreed to be the country as a whole, and the relevant product market that of gymnastic equipment.[16]

Essentially, the Government argues that the merger will engender anticompetitive consequences in three ways, each of which, it insists, constitutes an independent basis for imposing a preliminary injunction. First, it would entrench and possibly increase Nissen's already leading market position in gymnastic apparatus, while at the same time discouraging smaller competitors from aggressive competition with Nissen and deterring other companies from entering the market. Second, it would eliminate Wilson as an important potential entrant into the market through either internal expansion or through merger with a smaller company, and end its role as a company on the fringe of the market as a restraining influence on prices and profit margins. Third, it would entrench and increase Wilson's leading role in the sporting goods market and eliminate the actual and potential competition that an independent or otherwise merged

Nissen might have mounted against Wilson.

We believe it is fair to say that this case presents analytical difficulties of greater magnitude than did either *Clorox* or *General Foods*. The acquiring companies in both of those cases were giant producers of a variety of heavily advertised household items. Prior to its merger with General Foods, the S.O.S. company, a manufacturer of steel wool pads, was the largest competitor in an "almost perfectly balanced duopoly." (386 F.2d at 938). Prior to its merger with Procter & Gamble, Clorox was the leading manufacturer in the highly concentrated household liquid bleach industry. Because the products of both Clorox and S.O.S. could not be said to enjoy a qualitative distinction from the competitive products,[17] the impact of advertising and sales promotion was unusually high—indeed decisive—as it would be with respect to virtually every interchangeable mass-consumer product. In *Clorox*, the Supreme Court concluded that the substitution of Procter, with its huge assets and advertising budget, for the already dominant Clorox, would reduce the competitive structure of the industry, by raising already high entry barriers, dissuading present competitors from aggressively competing, and eliminating Procter as a potential entrant itself, and as an influence on prices and profit margins by its presence on the fringe of the market.

In *General Foods*, where advertising and sales promotion was equally vital, the

---

16. That several of the smaller apparatus manufacturers sell only locally or regionally, does not change the relevant geographical market. Those manufacturers are so small (see note 5 supra) that their shares, even of the regional markets, are not competitively significant on an individual basis. No evidence was introduced to indicate that any of Nissen's principal competitors pose more severe competitive threats in specific regions than they do in the United States generally.

Likewise, Nissen owns the largest market shares of both Olympic and non-

classical equipment. The impact of the proposed merger, if any, would appear to fall equally upon both segments of the market. Thus, it would not appear fruitful to create product submarkets based upon those quality distinct product types.

17. " * * * (A)ll liquid bleach is chemically identical * * *." F.T.C. v. Procter & Gamble, supra 386 U.S. at 572, 87 S.Ct. at 1227.

" * * * (T)he products of the corpetitors were functionally identical * * *." General Foods Corp. v. F.T.C., supra, 386 F.2d at 945.

Court held that the substituton of General Foods for S.O.S. would lessen competition by likewise heightening already substantial barriers to entry, and unlike *Clorox,* by eliminating the competitive balance existing between S.O.S. and Brillo, its chief competitor, and leaving the merged S.O.S. with decisive competitive advantages. The Court noted, even where competition is of an oligopolistic nature, it should be preserved if the alternative is a lessening of competition. (386 F.2d at 946). The major distinction between *Clorox* and *General Foods* is that in the latter, the Commission did not find that General Foods was a potential competitor sitting on the fringe of the market exerting an influence upon existing competition. But, it concluded, "we do not read *Clorox* as holding that 'product extension' mergers must involve the elimination of this type of potential competition to run afoul of the Clayton Act." (386 F.2d at 946).

The instant case poses quite different problems than either *Clorox* or *General Foods.* Primarily, this is because sales of gymnastic apparatus, unlike steel wool pads or bleach, are based largely upon the product's quality. Despite the Government's argument that advertising is important in this industry, it is quite clear that mass-advertising plays no significant role whatsoever. In contrast, the role of mass-advertising in selling high turnover products was found to be directly related to the probable anticompetitive effects of the *Clorox* and *General Foods* mergers. The huge resources of both Procter and General Foods, it was found, would enable them to divert significant portions of their advertising budgets to meet threats from new entrants and to use their volume discounts to advantage. The immense capital necessary to cope with advertising needs was a significant reason for the substantial barriers to new entry already extant in both markets prior to the mergers, but heightened even further as a result of the mergers. Thus advertising was largely responsible for the concentrated market structures existing in both markets. As the Supreme Court has recognized previously in American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), high turnover, low priced, mass marketed commodities which for all practical purposes are functionally and chemically identical, must rely heavily upon advertising, for they tend to be purchased by unsophisticated buyers on the basis of emotional appeal rather than upon the intrinsic merits of the product.

But where, as here, products are not purchased emotionally, but on the basis of a rational and well considered decision, large advertising expenditures are not likely to play a major role. This was recognized in Butler Aviation Co. v. Civil Aeronautics Board, 389 F.2d 517 (2d Cir. 1968), where the Court rejected a contention that the acquisition of a supplier of executive jet aircraft by Eastern Airlines would give the acquired company an undue competitive edge over sellers lacking comparable resources. The Court reasoned that a purchaser of jet aircraft, unlike a purchaser of chemically identical household bleach, "is likely to make a rational and well-considered choice as to which airplane best suits its requirements rather than yield to a salesman's blandishments." (520).

The evidence is reasonably clear that gymnastic equipment is not purchased on impulse or on the basis of an emotional response to advertising. Apparently, gymnastic coaches have a decisive voice in purchasing decisions, and their decisions rest primarily upon the intrinsic merit of the product. They examine equipment displayed at demonstrations, meets, or clinics, and have their gymnasts try it out. A coach is primarily interested in the safety, durability and performance characteristics of the equipment, and is able to differentiate among various items of apparatus on the basis of his own knowledge and experience, or on the basis of team members' comments. As one witness testified, "it is too big

an investment" to be made on the basis of advertising.[18]

The purchasing pattern is similar in institutions lacking a knowledgeable person in the field. The practice is for the person responsible for purchasing to consult persons who are sophisticated in the gymnastic field.

Indeed, Nissen's advertising is limited to coaches' publications, and is modest in amount (about $30,000 per annum). Several years ago it placed a full page ad in *Life* magazine, but the results were so dismal that the experiment has not been repeated. Wilson's larger resources would be of no use to Nissen for advertising purposes, since Nissen now spends as much as can be productively expended for this purpose.[19]

Promotion, at clinics, demonstrations, and meets is somewhat more significant in the industry than advertising. Nissen spends about $100,000 a year for this purpose, and considers this the maximum amount which could be productively expended. The company is capable of spending much more for this purpose, said Mr. Nissen, but it would be economically imprudent to do so.[20] Thus access to Wilson's assets would be of no help here either, for Nissen, unlike Clorox, has not been hindered by lack of resources in carrying out more beneficial advertising or promotional activities.

The effect of advertising upon market structure and competition in *Clorox* and

*General Foods* is totally absent here. It is safe to say that the market structure and the condition of entry is not at all affected by the factor of advertising here, which means that the considerations governing in both preceding cases will not be decisive on the facts now presented.

Nevertheless, the Government contends that existing competition will be adversely affected by the merger.

### Effects on Present Competition

The industry is highly concentrated as was pointed out above. Nevertheless, since competition is based only partially on price because of product differentiation, there has remained a relatively healthy degree of product competition. Nissen, of course, is the premier firm in the industry, but as a rule, many of its prices are higher than those of its competitors. The market is small enough, however, so that each competitor is keenly aware of innovations, prices and competitive steps taken by his adversaries. No concrete evidence was introduced to indicate any type of price leadership or "conscious parallelism." Because of rising demand, Nissen's market share has fallen from 38% to 32% since 1965, despite a substantial sales and profit increase.

The rate of demand and profit has attracted a number of new companies into the industry in recent years. The technology is not complex, the relevant ma-

---

18. Walden Tr. 271–72.

19. Where products are bought as the result of rational decision making, rather than on impulse, they usually are either quality or highly expensive items. Advertising serves a function with respect thereto by providing the consumer with information. It also can serve the manufacturer's interest by helping to develop and maintain a reputation for quality. Both Nissen and Wilson have highly respected names in their various industries, for instance. Wilson's advertising budget is about $1.5 million annually, of which only about $30,000 is expended in coaches' magazines—the only media relevant to the sale of Nissen's products. In *Clorox* and *General Foods* it was

suggested that an advantage to the mergers would be the possibility of achieving and passing along advertising volume discounts to the newly acquired subsidiaries. Wilson would not have that advantage here for it already receives the maximum volume allowance—about $2000 annually—granted by the coaches' magazine in which Nissen advertises, even if their advertising operations were combined, which Wilson denies will happen.

20. It was estimated that there are 1100 gymnastic coaches in the United States, and it is possible to reach the large percentage of them by attending the major gymnastic championships and the major national clinics and educational conventions.

chinery is available, and entry on the basis of a relatively modest initial capital outlay is feasible.[21] Some companies have entered the market by first having the products manufactured for them and then have graduated to do their own manufacturing.

Of course, on an individual basis, new companies entering on a "shoestring and a prayer" would not offer direct competition to Nissen, since it is likely they would not manufacture their own products, or if they did, would be unable to manufacture Olympic apparatus. Collectively, of course, the effect of their increased competition has been the reduction of Nissen's market share. It appears that despite the industry's relative concentration, the same barriers to entry present in *Clorox* and *General Foods*— the immediate need for large advertising capital—are not present here. But because the market is relatively small, and concentrated, and the companies are keenly aware of their competitors' activities, we think it fair to characterize the market as "oligopolistic," although not nearly as highly "oligopolistic" as in *Clorox*.

■ The Wilson-Nissen merger would certainly change the character of the industry by casting a relative colossus (Wilson-LTV) into the midst of a group of small competitors. But unless it would tend to substantially "lessen competition," the merger cannot be barred, for size alone is an insufficient criterion, at least as yet, in the field of conglomerate mergers. Despite Wilson's representation that Nissen will be maintained

as a separate subsidiary, the Court believes it is highly unlikely that Nissen's competitive position could be worsened by the merger. Wilson's corporate planners believe that after the merger, Nissen will grow fast enough to retain its dominant position until at least 1975, and George Nissen thinks such estimates are "conservative."

One danger that may be introduced into a market by a disproportionately sized firm which sells other related products, is that the product involved in the merger may tend to receive favored treatment from distributors. In *Clorox* and *General Foods*, there was a danger of Clorox and S.O.S. receiving preferred shelf space from dealers, who were dependent upon the acquiring companies for other high demand products.

Nissen's gymnastic equipment is sold through sporting goods dealers, as are most of Wilson's products. Nissen relies upon 38 exclusive dealers, 17 of whom handle Wilson products also, and receives nearly half of its orders from those "picked up" by sporting goods dealers, most of whom sell Wilson's products. Wilson's products are marketed through more than 10,000 dealers, 90 per cent of all the sporting goods dealers in the country. Over a thousand of Wilson's dealers specialize in sales to schools.

Wilson offers its dealers a broad line of merchandise and the typical dealer is dependent upon Wilson for adequate credit, for cooperation in making joint visits to schools, and for assistance and a helpful price in bidding on large contracts. Wilson, of course, through its

21. Some of the examples are these. Gym-Master Co., formed in 1954 as Fenner-Hamilton Co., on an investment of $1500, now makes a full line of trampolines and gymnastic apparatus. Its sales have risen from about $426,000 in 1965, to about $890,000 in 1967.

Premier Products, a manufacturer of gym mats originally, began selling gymnastic apparatus made for it by others in 1962. It began its own manufacture in 1967, and today is operating at full production, in its own plant. Sales have risen from $535,000 in 1965 to $1,069,-000 in 1967.

Everlast Sporting Goods Co., which also had been a gym mat seller, began to manufacture gymnastic apparatus in 1966 when it acquired the Narragansett Company. Its sales of gymnastic apparatus rose from $127,000 in 1965, to about $226,000 in 1967.

American Athletic Equipment Co., started to manfacture trampolines in 1957 on an investment of $7000. It started to manufacture gymnastic apparatus in 1962, a year or two after Nissen. Its sales have grown from about $700,000 in 1965, to $1.8 million in 1967.

250 man sales force, attempts to accommodate its dealers, if possible. The dealer may have an "in" with a particular school and it is helpful to Wilson if the dealer is willing to suggest the Wilson product to the buyer, or to suggest that a Wilson product is "equal" to another brand specified in a contract. Wilson salesmen attempt to impress these considerations upon their dealers. (Tr. 216, Dep. 84; Govt. Exh. 17, p. 2).

It is significant that Nissen's products are sold through dealers, many of whom also handle Wilson products. Wilson contends that it does not force dealers to take its goods, and intends to keep separate the Wilson and Nissen promotion and distribution programs. In the absence of a past history of same, we would not assume for these purposes that Wilson would or could push Nissen's products on an unwilling dealer.

Nevertheless, Wilson does attempt to impress . upon dealers the desirable qualities of its products. And given the potential advantages which Wilson can afford a dealer, with regard to service, credit and billing, the incentive to treat Nissen's products favorably following a merger with Wilson, may even initiate with the dealer.

The reciprocity cases afford an apt analogy. In such cases, a large diversified firm acquiring a company in a related business may be able to use its purchasing power to cause the companies selling to it, to look to its newly acquired subsidiary for their own purchases of raw materials. With regard to such a case, it was written in United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3d Cir. 1963):

" * * * the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantage in securing the good will of the possessor."

Similarly, many sporting goods dealers would likely be quick to perceive the advantages of acting in such a way as to curry the favor of Wilson by affording favorable treatment to Nissen products, whether or not Wilson suggested the idea. Furthermore, as was recognized in *Clorox*, Section 7 is not only concerned with actual anticompetitive effects, but also with the probability of anticompetitive effects. It intends to arrest such effects in their incipiency.

And even though Wilson intends to market and distribute Nissen products separately, it is a given fact that many of the dealers who sell Nissen products also sell Wilson goods. Many of the school coaches or athletic directors who purchase equipment for other sports from Wilson salesmen, also happen to be in charge of gymnastics. And because both Wilson and Nissen make gym mats and gymnastic apparel, many coaches of gymnastics are in touch with Wilson salesmen already.

Indeed, it appears that many present Wilson dealers will wish to carry Nissen products, if the deluge of dealer letters which came to Wilson headquarters asking to carry the Nissen line, when the merger was announced, is any indication.[22]

Nissen insists that dealers are relatively unimportant to its operation since its sales force does the bulk of its selling, and the dealers merely place orders. It apparently does not intend to expand its dealership since it has found that dealers, through lack of specialized knowledge do not do a good job of selling gymnastic equipment. Nevertheless, Nissen continues to rely on dealers as logical conduits for its sales. And it has admitted that it picks up about half of its sales "off the street" from dealers other than its major ones. A local deal-

22. Wilson replied to the inquiring dealers that they should direct their inquiries to Nissen headquarters in Cedar Rapids, since Nissen would be operated as a separate company.

er with an "in" to certain purchasers could make the selling job much easier for a Nissen salesman. Likewise, as to many sales which are instigated by dealers who know of customers desirous of purchasing gymnastic equipment. Similar effects may occur with respect to sales to non-institutional buyers. A tip-off to a Nissen salesman or a direct selling effort by the dealer is likely to weigh the scales in Nissen's favor.

It may be likelier than not that Wilson will follow through on its plan to segregate Nissen. It is obligated to do so under the proxy statement. But once the merger is permitted, this Court would no longer have control of the situation, and many unforeseen factors could result in Nissen's complete integration with Wilson in the long run. Given Mr. Nissen's strong role in the company, it is conceivable that should he leave for any reason, Wilson would have less incentive to maintain segregated marketing and promotional operations. Furthermore, if Nissen's share of the market continues to decline, it is likely that Wilson would bring its resources to bear in some manner to maintain Nissen's position.

■■ Finally, the argument that the acquired company will be kept separate, though a consideration, is usually not entitled to weight, because it is inconsistent with Section 7's aim to prevent the creation of long run market power by acquisition. The merger cannot be defended as a mere "investment" once it appears that the acquiring company intends to vote its stock and exercise control. United States v. E. I. DuPont De Nemours Co., 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). In replying to a similar defense in United States v. Pennzoil, 252 F.Supp. 962, 984 (W.D.Pa. 1965), the Court said:

"It has been stated in evidence that if acquisition is permitted, Pennzoil intends to maintain Kendall as a separate entity and permit it to continue to function in the future as it has been doing heretofore. Under the factual circumstances as they exist, we cannot believe that where one corporation acquires the assets of another corporation and has absolute control over who shall be the officials of the acquired corporation, that human tendency will not constrain the acquiring corporation to favor retention of officials in the subsidiary corporation, who are most compliant and acquiescent to the wishes of those who control them. There can be little, if any, reliance upon the statement in the face of well-known tendencies of human conduct."

If the merger is allowed, we believe it more probable than not that Wilson's economic strength will enable Nissen's sales to benefit at the expense of its competitors, due to advantages at the dealer level. There is substantial reason to believe, in part from Wilson's and George Nissen's own predictions, that at the least, the merger will enable Nissen to retain its present market share, while it likely would have declined further in the face of increased competition, without the merger. This alone indicates that the merger would have a dampening effect upon competition in the long run, and will entrench Nissen in its number one spot in the industry.

Furthermore, we believe competition in the industry will be lessened because of the adverse psychological effects the merger will engender among Nissen's smaller rivals, and upon potential new entrants into the market. This factor was relied upon in both *Clorox*, 386 U.S. at 578, 87 S.Ct. 1224 and *General Foods*, 386 F.2d at 945. In *Clorox*, the Court said: (386 U.S. at 578, 87 S.Ct. at 1230)

"There is every reason to assume that the smaller firms would become more cautious in competing due to their fear of retaliation by Procter. It is probable that Procter would become the price leader and that oligopoly would become more rigid."

There was considerable testimony from competitors of Nissen that the merger would be detrimental to them.[23] Price

23. See Fenner, Tr. 158, Rosenfeld, Tr. 186, Nadorf, Tr. 218, Solin (Gov.Exh. 17, p. 2).

competition between Nissen and its competitors has not been too significant mainly because of Nissen's willingness to emphasize quality over low prices. The current price differential in the industry is maintained because Nissen's competitors are willing to give larger dealer discounts, presumably to make it worth their while to handle the competitors' lines, and partially because the competitors do not have the expense of an independent sales force. But if the price differential were to become significant and cut into Nissen's sales, it is likely that an unmerged Nissen would be able to cut prices sufficiently to regain its lost sales. Mr. Nissen so testified. Thus there is not great incentive, as it now stands, to engage in serious price competition with Nissen, especially while Nissen is content to take its high profit margins. Especially since Nissen's competitors are enjoying a period of rapid growth. Why should they rock the boat? Conceivably Nissen would be capable at this point of enforcing price discipline and if it wished, price leadership, by the implicit threat of retaliation for price cuts. It has substantial current assets, if not profits from other sources it could divert to that effort. In any event, it has much greater financial staying power than any of its competitors.

What could Wilson's massive resources add to that? Probably not much. It does not appear that the merger would create a greater risk of price leadership than now exists. It might. But we are now entering upon such wholly speculative ground that it has passed the bounds of utility. All that can be said, at most, is that a merger would further cow those firms, if any, which not might be hesitant to compete aggressively, and would instill a sense of unease into those firms which compete vigorously today.

But as Justice Harlan recognized in *Clorox*, 386 U.S. at 584, 87 S.Ct. 1224, the inference is equally as likely that small competitors of a merged firm would be stimulated to even greater efforts, and would be hesitant to slow down. Although they may indeed be fearful of retaliation, the risks resulting from slackening their efforts might loom larger in their minds.[24] See Turner, supra at 1355.

In sum, there is little evidence to support a finding that smaller firms will be dissuaded from competing aggressively.

However, there is more likelihood that small companies planning to enter the market would be more hesitant to do so with Wilson in the picture. See Turner, supra at 1356, and note 12 supra. This could be a serious threat to the long run increase of competition in the industry in view of the recent successful entry of a number of small companies, which has resulted in the diminution of Nissen's market share.

But Mr. Daly of Medalist Industries, a company which plans to enter the gymnastics apparatus market, indicated that his company's plans have not changed. Medalist, which manufactures both athletic products (1967 sales—$6 million), and industrial products (1967 sales—$10 million), conceivably might develop into a sizable competitor of Nissen.

But would Medalist be as successful against a merged Nissen? We can hardly believe it would either do as well or have an easier time.

And what about many of the small firms in the industry? What might they do? This industry is attractive. Aside from Medalist, there are several large full line sporting goods houses, not now in the gymnastics industry, but which must fairly be considered potential entrants. They are Spalding, MacGregor and Rawlings. Medalist attempted unsuccessfully to purchase Fenner-Hamilton Company (Gym-Master Co.).

---

24. The testimony of Mr. Sorensen, from American Athletic Equipment Company (Tr. 278–296, 295–296), and Mr. Goyette, of tiny Stadium Products Co. (Tr. 299–305), indicated that they planned to continue their efforts as vigorously as before, despite the merger.

Rawlings tried to acquire Nissen but lost out to Wilson. And both Spalding and MacGregor have indicated interest in entering the gymnastic apparatus market. Although small potential entrants might be deterred by the merger, it is not likely that large diversified companies such as the aforementioned would be easily diverted by the Wilson-Nissen merger. See Turner, supra at 1356–1357. What is most significant about the Wilson-Nissen merger is the effect it is likely to have on the probable courses of action to be taken by the present gymnastic companies and by the sporting goods firms which are the major likely entrants.

Previously, the other firms in the industry were doing well enough on their own so that they did not want to sell out, or did not think themselves large enough to do so. Thus, interested large firms like Medalist, Spalding and MacGregor had to give serious consideration to entering through internal expansion, a path which would have added additional competitors to the industry. But since the news of the proposed merger, several of the small companies have become seriously worried about their ultimate survival and are considering the possibility of merger with larger firms.[25] And the potential entrants like MacGregor, Spalding, Rawlings and Medalist may now believe that it would be safer *and easier* (as did Wilson) to enter by merger, than by internal expansion. If that happens, the number of potential competitors would be reduced. The changing ideas of the present and potential competitors since the announcement of the Wilson-Nissen merger, indicate a more conducive climate to the entry via merger rather than by internal expansion of the leading potential entrants.

It is not at all unlikely that a Wilson-Nissen merger could engender a series of responsive mergers that would have the effect of eliminating the major potential entrants. Such a trend would decrease the possibility of long run deconcentration of the industry by eliminating potential additional competitors, and would tend to decrease existing competition by eliminating as potential competitors the very firms on the edge of the market who are able to exert an effect upon the pricing decision of existing firms. Indeed, such a trend would likely increase concentration. For it would alter the structure of the industry from a group of relatively small single market firms, to an industry of large diversified firms. The likely effect would be to impede the growth or make unlikely the survival of the very small firms on the fringe of the market, and virtually end the day when a small firm could enter this industry with a small investment.

Not that competition between large firms is any less desirable than competition between small firms. For the test of the statute is "competition", not "competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). But such a market would probably constitute a rather tight knit oligopoly. A small group of large diversified firms competing against one another over a large range of products including those in the gymnastic apparatus field, would tend to reach somewhat different competitive decisions than those which small firms would reach, particularly where the threat of new entry had been considerably diminished. Turner, supra at 1357.

We think it of the utmost importance to maintain the relative competitive vigor which currently characterizes the gymnastic equipment market. Of course, competition would be increased by the entry via internal expansion of the larger potential entrants. A policy seeking to preserve competition is not subserved, on the facts of this case, by allowing the number one sporting goods company to merge with the number one gymnastic equipment manufacturer. The prob-

---

25. Mr. Fenner of Gym-Master (Tr. 157), Mr. Rosenfeld of Premier Products (Tr. 186), and Mr. Nadorf of Everlast Sporting Goods Company (Tr. 218), all expressed the belief that the smaller companies, including their own, would be forced to consider merger in order to stay competitive.

ability of this merger spurring a drastic change in the character of the market is too great a risk to approve it, when there are other more pro-competitive alternatives available. These are discussed later in this opinion.

The incipient danger of a significant change in market structure was recognized by the *General Foods* decision. In commenting upon the merger of S.O.S.' major rival Brillo with the larger and more diversified Purex Company, following the S.O.S.-General Foods merger, the Court said: (386 F.2d at 946)

> "While the Commission did not attempt to evaluate the effect that this merger would have in the steel soap pad market, it did note that the likelihood that a given merger will trigger other mergers and give impetus to further concentration is a relevant factor in assessing the anti-competitive effect of that merger. Brown Shoe Co. v. United States, 370 U.S. 294, 343-344, 82 S.Ct. 1502 (1962)."

See United States v. Continental Can Co., 378 U.S. 441, 461, 465, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

To summarize the probable effects of this merger upon existing competition, we have found: (1) that Nissen's competitive position will likely improve from the merger but certainly will not decline with Wilson's backing, and this is due in part, at least, to the marketing advantage Nissen's products will likely receive when marketed by Wilson dealers; (2) that the smaller rivals of Nissen may or may not compete as aggressively as before, but psychologically will fear the Wilson-Nissen combine, with the probable result in the long run that the industry would be transformed into a tighter oligopoly featuring large diversified companies with no serious threat from potential competitors; and (3) that small

potential entrants will be deterred from entering as a result of the merger.

### Elimination of Wilson as a Potential Entrant

The Government also argues that the merger would eliminate Wilson as a potential entrant itself, or reduce its influence upon the prices and profits of existing firms, as a recognized potential entrant waiting on the edge of the market.

In *Clorox*, the Court upheld the Commission's finding that the merger eliminated Procter as a potential competitor (386 U.S. at 580-81, 87 S.Ct. 1224).[26] This factor has also been of importance in several other recent Supreme Court decisions.[27]

Professor Turner explained the issues of potential competition this way: (Turner, supra at 1362)

> "Even though an acquiring company has not been a direct competitor in the acquired firm's industry, a conglomerate acquisition may diminish competitive influences from outside the market that might otherwise exist. Such adverse effects may come about in three different ways. First, as previously discussed, the acquisition may diminish potential competition by raising barriers to entry. Second, a conglomerate acquisition may remove as an independent competitive force a firm that, although not actually selling in the market of the acquired firm, has had a substantial impact on the behavior of companies in that market because it was recognized as a likely entrant. Finally, the merger may involve a firm that would actually have entered the acquired firm's market by internal expansion if the merger had not occurred. The latter two phenomena will often coincide; a firm that would have entered an industry by in-

---

**26.** But see Justice Harlan's concurrence at 585-86, 87 S.Ct. 1224.

**27.** United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964); United States v. Penn-Olin

Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); see also United States v. Standard Oil (N.J.), 253 F.Supp. 196 (D.N.J.1965).

ternal expansion will often be a firm that exerts an influence on market behavior even while it is an outsider. However, the two need not go together. It is not likely, for example, that the Ronson cigarette lighter company was recognized as a threat by the producers of electric razors before it expanded into that market. Therefore, the two possibilities deserve separate analytical treatment."

See *Clorox* 386 U.S. at 585–86, 87 S.Ct. 1224 (Harlan J. concurring).

We have already seen the potential effect of this merger upon the market structure of the gymnastic industry, and the long run implications such a transformation could have upon barriers to entry in the industry, and the nature of competition therein. We now will consider the second and third possible effects described by Professor Turner, with respect to Wilson.

As we have previously stated, the gymnastic apparatus market is ripe for entry, due to its rapidly expanding demand and high profit margins. The technological and capital requirements for entry are not substantial, and a number of companies have become relatively serious competitors after entering with a nominal capital investment.

We have also discussed some of the most logical potential entrants—MacGregor, Rawlings, Spalding, and Medalist. There is evidence that MacGregor, Spalding and Medalist have considered entering the market through internal expansion.[28] And Rawlings attempted to purchase Nissen. We have concluded

that whatever their intentions prior to the announcement of this merger, the increased willingness of present Nissen competitors to consider merger, would shade the inclinations of potential entrants thereafter toward entry by merger with an existing company, if in fact they take any steps toward entering the market.

There is no evidence in writing or otherwise that Wilson would have entered the market independently of the instant merger. And Wilson denies vehemently that it would consider entering the market through internal expansion.

The problem of proof on this issue is difficult, because so-called "subjective" evidence of intent is rarely available,[29] certainly less so since the Supreme Court's reliance thereon in such cases as Clorox and F.T.C. v. Consolidated Foods Corp., 380 U.S. 592, 596, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).[30] See also United States v. General Dynamics Corp., 258 F.Supp. 36, 43 (S.D.N.Y.1966).

But in United States v. Penn-Olin Chemical Co. 378 U.S. 158, 175, 84 S.Ct. 1710 (1964), the Supreme Court indicated that to require subjective evidence would convert the "statutory requirement of reasonable probability into a requirement of certainty." Hence, in considering the likelihood of Wilson's entry but for the merger, we may consider whatever objective factors throw light on the issue. United States v. Penn-Olin, supra, at 174–175, 84 S.Ct. 1710, 1719.[31]

---

**28.** See Govt.Exh. 11; Daly Tr. 310–12; 316–318.

**29.** See Laughlin, Naughty Words of Antitrust, 54 A.B.A.J. 246 (1968).

**30.** A Procter & Gamble report relied upon by both the Commission and the Court, stated:
"Taking over the Clorox business * * * could be a way of achieving a dominant position in the liquid bleach market quickly, which would pay out reasonably well."
And in Consolidated Foods, a reciprocity case, the Court seized upon the fol-

lowing statement of a company official: "Everyone believes in reciprocity providing all things are equal."

**31.** The problems of proof have been discussed in several articles. Brodley, Oligopoly Power under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan.L. 285, 332; Turner, supra at 1370–1379, 1383–1385; Hale and Hale, Potential Competition Under Section 7; The Supreme Court's Crystal Ball, 1964 Supreme Court Review 171, 180–188.

There are a number of economic factors which tend to support a conclusion that Wilson would enter via internal expansion if this merger were prohibited. First, the sale of gymnastic equipment is extremely closely related to the sale of other team equipment to schools and institutions. It would be logical for a broad line sporting goods house such as Wilson to enter the gymnastic apparatus market and add a natural complement to its line. Second, the market is rapidly expanding and offers attractive opportunities for profitable operations. Third, there was testimony from certain of Nissen's competitors that they regarded Wilson and other full line sporting goods houses as the most likely potential entrants. Fourth, by its own admission, Wilson is physically capable of entering the business at any time. It already has facilities for metal working and chrome-plating, and whatever other facilities are necessary are within its financial reach. There are no technological barriers to its independent entry. Fifth, Wilson already has a large marketing staff which deals with many of the same persons and dealers who would be likely purchasers of gymnastic equipment. If it needs to add a few former gymnasts to its sales force, it could easily do so. Sixth, Wilson's respected name in athletic equipment would certainly inure to the benefit of any new product which it introduced. Finally, and perhaps most important, Wilson has indicated by this proposed merger its interest in the market.

These factors are counterbalanced not only by the lack of subjective evidence of Wilson's desire to enter through internal expansion, but by certain objective factors as well. Historically, Wilson has confined new product development to its existing product areas of golf, tennis, baseball, basketball, and football. Neither has it expanded internally into other unrelated areas such as skiing, fishing tackle, archery, and rubber products, such as balls, although its planning reports indicate a desire to enter these areas via acquisitions. Finally, an internal forecast of Wilson's sales' growth in the gymnastic equipment field (gym mats, etc.) anticipates a sales increase from $337,000 in 1967 to $376,000 in 1972, an increase accounted for entirely by anticipated price increases rather than by any increase in volume of sales.[32] It is possible, if Wilson had any intentions of entering the gymnastic field internally, that the figures would have reflected a greatly increased sales growth.

From all of these factors, we conclude only that there is not clear proof that Wilson would probably have entered through internal expansion. In the decisions which have considered and applied the potential competition concept, there has been, at the minimum, evidence that the alleged potential entrant was actually interested in entering the market through internal growth.

In *Clorox,* where the elimination of Proctor's competition was one ground for the decision, the Supreme Court found that Proctor "had considered the possibility of independently entering but decided against it because the acquisition of Clorox would enable Proctor to capture a more commanding share of the market." 386 U.S. at 580, 581, 87 S.Ct. at 1231. Additionally, it was found that Proctor was the most likely entrant and that few other firms would have been able to challenge as solidly entrenched a firm as Clorox.

In United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), the fact that the acquired company was a potential entrant into the market, as evidenced by its prior unsuccessful attempts to enter, was relied upon to invalidate the merger.

---

**32.** Def.Exh. 16. There is no indication when the forecast was prepared, although we should assume, in view of defendants' argument on the point, that it was prepared prior to the proposed merger, or at least not in anticipation of this litigation.

The Court held that the significance of potential competition under Section 7 is determined "by the nearness of the absorbed company to (the market), that company's eagerness to enter that market, its resourcefulness, and so on." (376 U.S. at 660, 84 S.Ct. at 1049).

In United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710 (1964), the Court found sufficient evidence to indicate that either or both of the joint venturers might have entered the relevant market so that their merger eliminated significant potential competition. The Court found that both parties, but few other corporations, had the inclination, resources and know how to enter the relevant market, that each had been identified with the industry, had evidenced a long sustained interest in entering the market, had a good reputation and business connections with major consumers, and finally, had strong business reasons for wanting to enter. (376 U.S., at 175, 84 S.Ct. 1044). On the remand, the district court concluded that there was no reasonable probability that either would have entered the market independently, and this result was affirmed by an equally divided court.[33] United States v. Penn-Olin Chemical Co., 246 F.Supp 917 (D.Del.1965), aff'd 389 U.S. 308, 88 S.Ct. 502, 19 L.Ed.2d 545 (1967).

The objective evidence that Wilson would have entered internally is not as strong as seems required, from the teaching of the prior cases. All that can be said is that Wilson had the capability to enter by internal growth if it so desired.

This finding, however, does not negative the probable influence on competition exercised by Wilson and its diversified neighbors MacGregor, Spalding, Rawlings, and the smaller Medalist, waiting on the fringes of the market. Spalding, MacGregor and Medalist have given some thought to entering the industry by internal expansion, and Rawlings attempted to enter by purchasing Nissen. With these larger companies posing a threat as potential entrants themselves, it is likely that the current manufacturers' market behavior is influenced not only by their actual competition, but by their potential competition, as well. Clorox, 386 U.S. at 581, 87 S.Ct. 1224. There certainly are no significant barriers to the entry of these firms by internal expansion.

And despite our finding that the evidence did not support a conclusion that Wilson intended to enter internally, the firms in the industry did not know this. All they knew was that Wilson was one of a group in a logical position to enter and with the resources to do so.

Despite the relative case with which firms with minimal capital can enter the market presently, we believe the elimination of even one of the larger potential entrants by merger with a leading firm in the gymnastic apparatus market might be significant. For as described earlier regarding this industry, it could easily be the trigger to a round of mergers which would transform the nature of the industry. Although the other large firms would still be on the fringe following the first merger, it is less likely that they would consider entering by internal expansion and the remaining existing competitors would probably encourage that trend by expressing interest in merger themselves. Loss through merger of one of a recognized small group of significant potential entrants, lessens the likelihood of future deconcentration for its removes a company which could have been expected to furnish significant competition to the leading firms in the industry had it entered. That tiny firms can still enter is insignificant in this context because they do not constitute a significant competitive force due to their inability to produce Olympic equip-

---

33. It appears that a shift in the court's personnel was responsible for the equal split in the Supreme Court. Justice Clark who wrote the original Penn-Olin opinion, (378 U.S. 158, 84 S.Ct. 1710), had retired by the time the case returned. His successor, Justice Marshall, who was Solicitor General during the pendency of the case, took no part in its consideration the second time around.

ment.[34] We have already found, supra, that an immediate effect of the instant merger will probably be to raise the entry barriers to small firms which had previously considered coming in. The future of the tiny firms' survival, let alone their prospects of entry, is problematical, if the industry's market structure becomes more concentrated.

Nevertheless, the loss of Wilson's influence on competition as one of a recognized small group of large potential entrants, waiting on the edge of the market, constitutes only one factor in opposition to the merger. Were it the only factor, it would not be sufficient to block the merger. See Turner at 1368–1369. This factor should be added to the three other anti-competitive effects summarized above.

Finally, what would Wilson be likely to do if its current merger plan is thwarted? Well, virtually anything it could do would be more pro-competitive than the path it has chosen. It is aware of the attractive opportunities in the gymnastic apparatus field, and like Proctor & Gamble in *Clorox*, has decided upon a quick and easy way to buy a leading position in the industry. If Wilson were to enter through internal expansion, that obviously would increase competition by adding another competitor to the market. If instead it entered by buying one of the small companies in the field, "it would have the effect of increasing the strength of a small company at the expense of the leading companies, and that would be

more pro-competitive."[35] If it simply continued waiting on the sidelines as an interested bystander, that might have some effect in restraining price exploitation in the market, and that would be more pro-competitive.

Hence, by disallowing the merger we would insure a benefit to competition in the market. It is apparent, therefore, that the proposed merger would probably have the effect of lessening competition in the industry, in violation of Section 7.

But there is more, as we shall see below.

### Entrenching of Wilson in the Sporting Goods Industry

The Government finally argues that the merger should be barred because it will entrench Wilson's position as the leading seller of a broad line of sporting goods in America. On the facts presented, we would hesitate to block a merger on this ground alone, although the Government urges that we may, because the chief danger to competition from this merger is in the gymnastic apparatus market. But coupled with the other anti-competitive factors discussed above, we believe it constitutes a meaningful argument.

In judging the market structure of the sporting goods industry, and Wilson's share of it, we prefer to use the figures of the Athletic Goods Manufacturers' Association (AGMA), over those of the Bureau of the Census.[36] A line of com-

34. The Government conceded in its brief in the *Clorox* case that "eliminating one of many equally able and willing potential entrants would not substantially impair the efficacy of potential competition." (p. 34) See also Turner at 1368. But in the instant factual context, even though there appear no significant entry barriers to small firms, the number of large potential entrants is relatively few. These are the potential entrants, who, merging with the leading firms, would cause a danger of so altering the market structure, that the small firms might be unable to enter the market, at some later date. As we have repeatedly emphasized, the action called for by law is to halt

anticompetitive effects in their incipiency. *Clorox* 386 U.S. at 577, 87 S.Ct. 1224.

35. Quotation of Government counsel, Mr. Davidow, at closing arguments. (Tr. 25)

36. The AGMA figures are belittled by defendant on the ground of their incompleteness. Although over 600 questionnaires were sent out by AGMA in 1966, its figures list a response from just 110 firms. Nevertheless, virtually all of the significant national sporting goods companies reported their figures to AGMA, so that its figures represent a fairly accurate, though not completely

564

merce known as "sporting goods" and measured in terms of AGMA figures was approved in a previous Section 7 case directing Spalding to divest itself of Rawlings with whom it had merged. A. G. Spalding & Bros., Inc. v. F.T.C., 301 F.2d 585, 603, 612 (3d Cir. 1962).

Wilson is conceded to be the largest manufacturer and seller of a broad line of sporting goods. The AGMA figures show that Wilson's market share in 1966 was 28%, which is half again as large as Spalding, its closest rival, and more than twice the size of MacGregor and Rawlings, its other two major competitors. These four companies account for over 60% of the sales of the 110 companies reporting to AGMA. The industry appears to be concentrated, although small companies apparently do well in isolated items of equipment. Wilson's leadership is reflected not only by its sales percentage, but by its broad line, wide distribution, and respected brand name.

This merger would have three effects insofar as Wilson's competitive position is concerned: First, it would entrench Wilson's position in the sporting goods industry by allowing it to add a respected brand of gymnastic equipment to its family, and under the Nissen trademark. Second, it would eliminate in the future

any competition that now exists between Wilson and Nissen in the products which both presently produce. And thirdly, it would eliminate all future competition which might develop between Wilson and an independent or otherwise merged Nissen.

As we have already indicated, the probabilities are great that Nissen's products will command an increased or at least undiminished share of the gymnastic apparatus market should the merger be consummated. Wilson's rapport with 90% of the sporting goods dealers is an important reason for this conclusion. Even though Nissen will probably be kept separate, the merger will be beneficial to both Wilson and Nissen and will entrench Wilson's already dominant share of the sporting goods market. This probability is additionally supported if we consider Wilson's five-year plan to acquire leading companies in several other areas in which it is not now a competitor (archery, fishing tackle, skiing and rubber products). As was stated in United States v. Continental Can Co., 378 U.S. 441, 463–464, 84 S.Ct. 1738, 1750 (1964):

"Continental would view these developments as representing an acceptable effort by it to diversify its product lines and to gain the resulting competitive

satisfactory, picture of the sales of sporting goods companies.

Defendant thinks we should use the survey of sporting goods companies prepared by the Bureau of the Census. That survey however, includes all manufacturers, whether or not they engage in their own distribution or market products under their own brand name. It includes sales of establishments with 4 or 5 employees, of companies that sell only one product, or market in a single city or state, and includes all products definable as sporting goods, whatever their price or level of quality.

Such figures are so all-inclusive as to be a highly inaccurate means of measuring effective competition. For example, in the same figures, Nissen is lumped with Wilson and the other broad-lined companies, and all other manufacturers of sporting goods products. But Nissen and a manufacturer of baseballs, for example, have no competitive significance

to one another. It is meaningless to compare their respective shares of the Census-defined sporting goods market. Indeed, Nissen comes away with less than 1% of that market. From these figures it would be impossible to reach the meaningful conclusions that can be reached by comparing Nissen's sales with those of other firms manufacturing gymnastic equipment.

For the same reasons, it is meaningless to compare Wilson's figures with those of a small manufacturer of fishing tackle, for example, which Wilson does not produce. It is only meaningful to compare Wilson's figures with those of other broad-lined sporting goods houses. The AGMA survey more closely approaches this than does the Census survey.

We should note, that under either survey, Wilson is the leader, albeit with 28% of the market from AGMA's survey in 1966, and only 4% from the 1965 Census figures.

advantages, thereby strengthening competition which it declared the anti-trust laws are designed to promote. But we think the answer is otherwise when a dominant firm in a line of commerce in which market power is already concentrated among a few firms makes an acquisition which enhances its market power and the vigor and effectiveness of its own competitive efforts."

Secondly, whatever present competition between Nissen and Wilson now exists in the areas of gym mats, wainscotting, sweat suits, basketball backboards, volleyball standards, and table tennis tables, would be eliminated by the merger. Even though Nissen may be separately maintained, we would place too much faith in human nature if we believed that Nissen and Wilson would continue to fight for business in the same product areas. It is more likely that one of the two companies would drop a line which the other would continue to sell. Since Wilson does not manufacture most of these items anyway, but only purchases them from other manufacturers, such a result is probable.

The evidence does not indicate, however, that a substantial element of existing horizontal competition would be foreclosed by this merger. Wilson does not advertise or promote the overlapping products actively, and Mr. Nissen could not recall any instance where the two companies were attempting to sell any of them to the same customer. Nevertheless, it is a fact that almost half of Nissen's major dealers also sell Wilson products, and 90% of the dealers who "pick up" orders for Nissen (almost half of its business) are Wilson dealers.

But in any event, the sales of each company are minor with respect to the overlapping items.[37] The dollar figures actually overstate the degree of competitive overlap because of qualitative and other distinctions between the products sold by each company.

For example, Nissen sells only one type of table tennis table, which retails at about $35 higher than the highest quality table sold by Wilson. In volleyball, the only common item is volleyball standards, with respect to which Wilson's 1967 sales were only $23,000 and Nissen's about $54,000. They make different types of gym mats also, Wilson mainly a hair-felt type mat, and Nissen a self-expanding polyethylene mat. And their appeal in the basketball backboard business is directed to different purchasers. Nissen is in the business of designing and installing complete backboard systems in new gymnasiums, whereas Wilson is strictly a supplier of backboards and goals as replacement parts in existing installations.

It is, however, as to potential future competition between the two companies that this merger poses a great anti-competitive threat. Nissen has developed a series of new products in the last few years. It intends to introduce a complete line of track and field equipment very soon.

There is no reason to think a merged Nissen would continue to develop products in direct competition to those of Wilson. Yet that has been the history of its pre-merger days. It is yet a relatively small company compared with the broad-lined companies. But if it remains independent or merges with a smaller sporting goods company than Wilson, such as the proposed mergers of Medalist and Gym-Master, or American Athletic Equipment Co. and Head Ski Company (Tr. 288), it is probable that it will continue to diversify its product line, and ultimately could pose a competitive challenge to the large broad-lined sporting goods companies, four of which control

---

**37.** Defense exhibits 29–33 show the comparative figures (all 1967 figures). Sales of Wilson table tennis tables were about $71,000; Nissen's $148,000. Sales of volleyball equipment by Wilson was $519,-000 to only $67,000 for Nissen. Wilson sold $147,000 worth of gym mats, while Nissen, considering them to be a major item, sold $756,000. And Wilson sold $277,000 worth of basketball backboards, goals and sets, while Nissen's sales of backboard sets were $35,000.

close to half of market sales. This is speculation to be sure, but it is not without basis. It is indeed probable if Nissen continues along the same road it has traveled. This kind of development of a broad line competitor is exactly what Section 7 is designed to preserve.

George Nissen has received a number of offers for his company. Should we block this merger and he still desired to sell, he would have no problem in doing so, for his company is thriving, indeed the leading company in a growing field. In this court's judgment, it would be procompetitive for Nissen to merge with a company smaller than Wilson, conceivably another single line company, and form a combination, which eventually could become a diversified threat to Wilson and its major competitors. In addition, depending upon the partner to the merger, it may not have the same anticompetitive effects in the gymnastic equipment market as would the merger of Wilson, the leading broad-based sporting goods company, and Nissen the leading gymnastics apparatus manufacturer. Certainly Nissen can develop an alternative lacking the anti-competitive forces of the proposed merger.

■ In summation, we observe that the lengthy discussion above has outlined the major probable anti-competitive consequences of the proposed merger.

The defendant has not offered any countervailing economies which might be weighed against the adverse effects of the merger.[38] Although the majority in *Clorox* eschewed the possibility of such a defense,[39] Justice Harlan in his thoughtful concurrence, stated what appears to be a reasonable proposition, 386 U.S. at 598, 87 S.Ct. at 1240;

"Thus when the case against a conglomerate or product-extension merger rests on a market-structure demonstration that the likelihood of anticompetitive consequences has been substantially increased, the responsible agency should then move on to examine and weigh possible efficiencies arising from the merger in order to determine whether, on balance, competition has been substantially lessened.[15] Where detriments to competition are apt to be 'highly speculative' it seems wisest to conclude that 'possibilities of adverse effects on competitive behavior are worth worrying about only when the merger does not involve substantial economies * * *.' Turner, supra, at 1354. The Court must proceed with caution in this area lest its decision 'over the long run deter new market entry and tend to stifle the very competition it seeks to foster.' United States v. Von's Grocery Co., 384 U.S. 270, 301 86 S.Ct. 1478 [,1495,] 16 L.Ed.2d 555 (Stewart, J., dissenting.)"

---

**38.** Procter & Gamble defended its merger with Clorox by citing the economies resulting from the merger, largely in advertising expenditures. The Commission accepted the idea that economies could be used to defend a merger since a "merger that results in increased efficiency of production, distribution or marketing may, in certain cases, increase the vigor of competition in the relevant market." 386 U.S. at 603, 87 S.Ct. at 1243; (quoting from the Commission's opinion.) But it placed advertising economies in a separate classification since they tended only to increase barriers to entry.

The Supreme Court majority did not analyze the economies' defense stating only that "possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies, but it struck the balance in favor of protecting competition." Justice Harlan, however, agreed with the Commission that economies were proper in defense of a merger, "where the case against the merger rests on the probability of increased market power," (at 599, 87 S.Ct. at 1241) since it is possible that "certain economies are inherent in the idea of competition." (at 597, 87 S.Ct. at 1240). His view strikes this Court as more logical than the majority's approach. He took exception with the Commission viewpoint on advertising economies however, and stated that "true" economies in advertising should be a permissible defense. (at 603, 87 S.Ct. 1224). Turner, supra at 1339.

**39.** See note 38 supra.

We believe the anticompetitive effects of the instant merger stand unrebutted by any positive advantages it may serve. Indeed, we have seen that virtually any other manner in which Wilson enters this market, or in which Nissen accomplishes its merger, would have more beneficial effects upon competition, both present and potential, than the instant merger.

We have pondered the issues raised by this case long and hard and have attempted to proceed with caution in the realization that we are dealing with probabilities and that there is precious little in the law to guide us. We have heeded Professor Turner's admonition that "whatever antimerger standards are adopted, they should generally be more severe for horizontal (and vertical) than for conglomerate mergers." Turner, supra at 1321, 1322. Above all, we have applied the particular facts of this case to the economic effects of the merger as we have seen them, and consciously have refrained from stating any rules of general application. Rule-making in this area is not the function of the district courts. Particularly is our course proper since the one major conglomerate merger case to be heard by the Supreme Court, *Clorox,* itself refrained from expressing any general rules to be applied in conglomerate merger cases. See Elman, Clorox and Conglomerate Mergers, 36 ABA Antitrust L.J. 23, 27 (1967).

Having found a probable lessening of competition in the relevant market, it remains to be decided whether to issue a preliminary injunction.

### Preliminary Injunction

The defendant has stood ready, since the commencement of this litigation, to agree to a stipulation that if allowed to consummate the merger, it will maintain the assets and operations of Nissen completely separate from those of Wilson pending this litigation, as it apparently has intended to do all along. The Government has opposed this procedure on the ground that a "hold-separate" order will harm competition and leave in doubt whether competition could ever be fully restored upon divestiture, should the Government prevail on the merits.

A further complicating factor is Nissen's statement that the issuance of a preliminary injunction would probably cause the abandonment of the merger plans, because of delay pending litigation. As the defendants put it, it would give the government a victory in fact, although not on the record.[40] Under the very broad language of Section 15 of the Clayton Act (15 U.S.C. Sec. 25), we apparently may issue a preliminary injunction upon a showing of reasonable probability that the Government will prevail upon the merits, United States v. Chrysler Corp., 232 F.Supp. 651, 657 (D.N.J. 1964), United States v. Crocker-Anglo National Bank, 223 F.Supp. 849, 850 (N. D.Cal.1963). We have found that probability. In view of the hearings which were held, and the voluminous briefs, affidavits and exhibits which were filed, we believe our findings are based upon reasonably reliable evidence. It is not additionally necessary for the Government to demonstrate a showing of probable injury to the public during trial, for the "enactment into law of the proposed amendment (to Section 7) was an expression of the public policy of the nation, and the threatened violation of the law here is itself sufficient public injury to justify the requested relief." United States v. Ingersoll-Rand Co., 218 F.Supp. 530, 544 (W.D.Pa.), affirmed 320 F.2d 509 (3d Cir. 1963).

40. Asset separation orders have been utilized previously. See, e.g., United States v. Brown Shoe Co., 1956 Trade Cas. Par. 71, 109 (E.D.Mo.1956) ; United States v. Phillips Petroleum Co., 1966 Trade Cas. Par. 71,872 (S.D.Cal.1966) ; United States v. Aluminum Ltd., 1965 Trade Cas. Par. 71, 366 (D.N.J.1965) ; United States v. Aluminum Co. of America, (Rome Cable), 1960 Trade Cas. Par. 76, 830 (N.D.N.Y.1960) ; United States v. Continental Ill. National Bank & Trust Co., 1961 Trade Cas. Par. 78,450 (N.D. Ill.1961) ; United States v. Aluminum Co. of America, (Cupples), 1962 Trade Cas. Par. 70,419 (1962).

But since equitable relief is sought, many courts have considered the probable injury to defendant that might ensue from the issuance of an injunction, in determining whether injunctive relief is proper.[41]

We are aware of no conglomerate merger case in which a preliminary injunction has been allowed,[42] and the issuance of preliminary injunctions has been infrequent in other Section 7 cases, as well.[43] Part of the reason is the alleged adequacy of divestiture as a remedy. See United States v. E. I. DuPont de Nemours & Co., 366 U.S. 316, 329, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); United States v. FMC Corporation, 218 F.Supp. 817, 822 (N.D.Cal.1963). Another reason may be that prior to F. T. C. v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), the Federal Trade Commission, which has been responsible for much of the activity in this field, was not empowered to seek preliminary relief. Additionally, in those cases where the merger had already occurred, the only remedy available was divestiture. In the past most Goverment challenges to mergers have postdated the merger's consummation.

In any event, we believe a proper test should consider the harm to defendants which would ensue from a preliminary injunction,[44] The alleged harm here is quite final—the abandonment of the merger plans.

The Nissen Company is highly salable at present, and it is likely, if held separate during this litigation, could be divested if the Government ultimately prevails. We recognize the difficulties which divestiture often entails, but believe divestiture herein might not pose the same difficulties as it has in many of the cases cited by the Government.[45]

---

41. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738,743 (2d Cir. 1953); United States v. Brown Shoe Company, 1956 Trade Cas. 71,109, 71,116 (E.D. Mo.1956); United States v. Parents Magazine Enterprises, 1962 Trade Cas. 76,757 (N.D.Ill.1962). But cf. United States v. Aluminium Ltd., 5 Trade Neg. Rep. (1965 Trade Cas. Par. 71,366 at 80,571 (D.N.J.1965); Note, Preliminary Injunctions and the Enforcement of Section 7 of the Clayton Act, 40 N.Y.U.L. Rev. 771, 776–77 (1965).

42. In United States v. Standard Oil (N. J.), 253 F.Supp. 196 (D.N.J.1966), the merger was not preliminarily enjoined and the parties stipulated that an earlier temporary restraining order would continue in effect pendente lite. In United States v. Ingersoll-Rand, 218 F.Supp. 530, (W.D.Pa.1963), there were conglomerate as well as horizontal effects, and both the district and circuit courts placed some emphasis on the former in justifying preliminary injunction. See 218 F.Supp. at 552, and 320 F.2d at 524.

43. But cf. United States v. Ingersoll-Rand Co., 218 F.Supp. 530 (W.D.Pa.1963); United States v. Chrysler Corp., 232 F. Supp. 651 (D.N.J.1964); United States v. Pennzoil, 252 F.Supp. 962 (W.D.Pa. 1965). And see Note, 40 N.Y.U.L.Rev. 771, 772 n. 9 (1965).

44. An excellent law review note is in agreement. Note, Preliminary Relief for the Government Under Section 7 of the Clayton Act, 79 Harv.L.Rev. 391 (1965). See also note 41 supra.

45. In both United States v. Schlitz Brewing Co., Civil No. 42127 (N.D.Calif.1964), and United States v. Reed Roller Bit Co., Civil No. 66–248 (W.D.Okl.1967), divestiture negotiations have been pending for over a year. And in several Section 7 cases where divestiture has been achieved, the task was very difficult. E. g. United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), 217 F.Supp. 761 (S.D.N.Y. 1964); United States v. Aluminum Company of America (Rome Cable), Civil No. 8030 (N.D.N.Y.1960); United States v. Brown Shoe Co., 179 F.Supp. 721 (E.D. Mo.) (370 U.S. 264, 82 S.Ct. 1502, 8 L. Ed.2d 510) (1962); United States v. Gamble-Skogmo Co., Civil No. 12776 (W. D.Mo.1960); But cf. United States v. Aluminum Co. of America (Cupples), 247 F.Supp. 308 (E.D.Mo.1964), affirmed 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965).

The Government cites 4 cases in which no sale was achieved, so that the acquiring company was allowed to keep its acquisition. United States v. Diebold, Inc., 197 F.Supp. 902, 906–907 (S.D. Ohio 1961), reversed 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (consent order issue discussed in 1962 Trade Cas. Par. 70,490); United States v. Kaiser Aluminum and Chemical Corp., Civil No.

Nevertheless, we have found it reasonably probable that anti-competitive effects will result from this merger. It is likely that the consummation of the merger under a hold-separate order would have many of the same anti-competitive effects during trial that a consummation without such an order would have. For example, Nissen's competitors would be likely to seek out mergers with larger companies that have expressed an interest in entering the market, so as to better compete with the Nissen-Wilson combine. The immediacy of this anti-competitive tendency is apparent and no order of this court can obviate that threat. Section 7 is designed to catch anti-competitive effects in their incipiency.

Also, it could be expected that despite a hold-separate order any small company which had heretofore intended to enter the market might be frightened off. Medalist Industries' statement that the merger would not affect its plans to enter, is not necessarily what might be expected as a typical response.

Certainly, it could be expected that whatever horizontal competition now exists between Nissen and Wilson would be lessened during the pendency of trial.

Finally, and perhaps of most importance, George Nissen, in a sense, is the Nissen Corporation. He founded it, nurtured it and brought it to where it is today. A major reason for the appeal to Wilson of the instant merger is the opportunity to become affiliated with a man of George Nissen's abilities. Once the merger is completed, the assets and stock transferred, George Nissen no longer will be a stockholder of Nissen, but will be a stockholder of Wilson, and merely an employee of Nissen, albeit a key one, subject to the control and direction of the Wilson-LTV directors. The elimination of the ownership in Nissen by George Nissen and other key personnel, may remove part of their personal incentive to promote Nissen's interests at the expense of Wilson's.

Assuming the Government prevails in this case, divestiture of Nissen could prove much more difficult, should George Nissen for any reason decide not to stay with Nissen after it is divested. Indeed, he may well prefer at that point, being a substantial shareholder of Wilson, to stay with the Wilson Company rather than take the unknown risks of working for new owners. At that point, Wilson might be anxious to take advantage of his know-how and expertise in developing its own entry in the gymnastic field, and might pay him well to stay. Certainly no court order of divestiture would compel George Nissen to follow the assets of his former company.

Should George Nissen indicate his unwillingness to stay with Nissen after divestiture, divestiture proceedings herein could become very difficult. Certainly the Nissen subsidiary would be much less salable without him and other key management personnel. Without him, Nissen's viability as a competitor would almost certainly be lessened.

Indeed, this opinion has already indicated the more pro-competitive alternatives which would likely occur, should this merger be enjoined. One of those is the probability that an independent or otherwise-merged Nissen (and presumably Nissen still would be a part of such company if this merger were barred) could eventually become a competitor to the large diversified sporting goods companies such as Wilson, MacGregor, Spalding and Rawlings. Were we to permit a hold-separate order in this case, it is possible if not probable that those alternatives might be less likely.

2795 (D.R.I.1965) (1965 Trade Cas. Par. 71,354) ; United States v. Aluminium Ltd., Civil No. 1174 (D.N.J.1964) (1966 Trade Cas. Par. 71, 895) ; United States v. Crown Textile Mfg. Co., Civil No. 3542 (E.D.Pa.1964) (1965 Trade Cas. Par. 71,-428). However, it appears in all of those cases there were extraordinary circumstances which interfered with attempts to divest the acquired companies. All of the acquired businesses were in some form of economic distress. Nissen, however, is in excellent financial condition, and several other sources, aside from Wilson, have expressed interest in acquiring it.

If Wilson and Nissen are obliged to abandon their present merger plans because of a preliminary injunction order, it would be unfortunate, but not as unfortunate as the probable adverse effects on competition in this industry which could commence during this very trial, or upon a finding of illegality after trial, should we allow the merger pending a hold-separate order.

To issue a preliminary injunction in this case, in an "uncharted area," where the finding that the Government will probably prevail is based largely on probability, may seem to be a bold step, in view of the history of the weapon as a remedy in Section 7 cases. But, we believe the probable adverse effects upon competition which might occur as a result of this merger, may well be irreversible if we permit the merger to be completed subject to a hold-separate order. See Note, 79 Harv.L.Rev. 391, 392 (1965).

Accordingly, we will issue an order preliminarily enjoining the defendants from consummating the proposed merger pending the outcome of this case.